John URMANN, Sr., and Mary Lee Urmann, Husband and Wife, Appellees

v.

ROCKWOOD CASUALTY INSURANCE COMPANY, Appellant

v.

George Spilka, Timothy Spilka, T/D/B/A the Spilka Wood Products, Appellees.

Superior Court of Pennsylvania.

Argued Nov. 30, 2005.

Filed July 31, 2006.

Michael D. Sherman, Pittsburgh, for appellant.

David S. Pontzer, Ridgway, for Urmann, appellees.

BEFORE: LALLY–GREEN, TODD, and McCAFFERY, JJ.

OPINION BY McCAFFERY, J.:

¶ 1 Appellant, Rockwood Casualty Insurance Company, appeals from the order of the Court of Common Pleas of McKean County approving a settlement agreement that provides for a $250,000 recovery for the loss of consortium claims of Appellee, Mary Lee Urmann ("Mrs.Urmann"), and a $50,000 recovery for the personal injury claims of Appellee, John Urmann, Sr. ("Mr.Urmann").[1] Appellant, a workers' compensation insurance carrier, holds a subrogation lien against the settlement paid to Mr. Urmann by third-party tortfeasors, pursuant to Section 319 of the Workers' Compensation Act (the "Act"), 77 P.S. § 671. After careful review, we conclude that the trial court neither abused its discretion nor erred as a matter of law in approving the settlement agreement, and accordingly, we affirm.

¶ 2 The facts of this case are taken from the record below. Mr. Urmann was the president and owner of Valley Coal & Supply Company ("Valley Coal"). On January 27, 1995, Mr. Urmann was severely injured in an automobile accident while in the course of his employment. Appellant, as the workers' compensation carrier for Valley Coal, commenced payment of workers' compensation wage loss and medical benefits to Mr. Urmann.

¶ 3 The Urmanns thereafter initiated a third-party tortfeasor action against Appellees, George Spilka and Timothy Spilka t/d/b/a The Spilka Wood Products ("Spilka"), alleging that Spilka's negligence was responsible in part for the Urmanns' injuries. While Mr. Urmann's claims were for injuries directly sustained in the automobile accident, Mrs. Urmann's claims were for loss of consortium.

¶ 4 Through mediation efforts before former Judge Murphy of the Court of Common Pleas of Allegheny County, the Urmanns and Spilka arrived at a settlement of $300,000 to cover all claims. Of this amount, $50,000 was to be paid to Mr. Urmann for his physical and mental injuries, and $250,000 was to be paid to Mrs. Urmann for her loss of consortium. Appellant was notified of the pending settlement, and the Urmanns petitioned the trial court to approve the terms of the settlement. Appellant opposed approval, based not on the total settlement amount, but on the apportionment of the settlement, which assigned over 80% of the recovery to Mrs. Urmann for her loss of consortium claims.

¶ 5 At an evidentiary hearing before the Honorable John M. Cleland, President Judge, the Urmanns presented three witnesses, while Appellant presented none. The Urmanns' first witness, Anthony Sciarrino, Esquire, represented Spilka during the settlement negotiations. Mr. Sciarrino testified that prior to mediation, Spilka's insurers had made an initial settlement offer of $25,000. (Notes of Testimony ("N.T."), 7/29/04, at 8, 19). Mr. Sciarrino's own analysis of the case led him to conclude that Mr. Urmann's damages alone were quite significant, and that Spilka's potential exposure for liability suggested a reasonable range for settlement of between $75,000 and $125,000. (*Id.* at 9, 19). During mediation, however, Mr. Sciarrino and the adjustor for Spilka's insurer, Rob-

1. (Collectively, Mr. and Mrs. Urmann shall be referred to as "the Urmanns").

ert Egee,[2] had the opportunity to meet the Urmanns and assess Mr. Urmann's then-current condition and how Mr. Urmann's injuries impacted upon Mrs. Urmann, who was believed by Mr. Sciarrino to be a candid individual. (*Id.* at 11). While Mr. Urmann had largely recovered from his physical injuries, those injuries had disabled him mentally.[3] Although Mr. Urmann was mostly unaware of his mental deficits, Mrs. Urmann had to deal with them on a constant, daily basis. Based upon these facts, Mr. Sciarrino and Mr. Egee concluded that Mrs. Urmann's loss of consortium claims were far more substantive than the typical loss of consortium claim. As Mr. Sciarrino testified:

> [T]here is a tendency to not look at the consortium claim as a big component of most cases. The majority of the time it is not a large component. It is 10, 15, 20 percent.
>
> When we talked to Mrs. Urmann, I think we got a lot better appreciation of how things impacted her in many ways much more than Mr. Urmann. And that—that weighed heavily on us.
>
> The best way I can analogize to it is to say that my father has Alzheimers. It's not in the late stages, it is in the beginning. But I can see he isn't aware of memory loss, he isn't aware of things that happen to him, but my mother is, and I see the impact it has.
>
> And when Bob Egee and I talked about it we analogized to that, that to a certain degree Mr. Urmann is blissfully unaware of some of his problems[,] where Mrs. Urmann ends up being—carrying

the emotional weight of that. And that impacted our analysis.

> And up until I met them in person and we talked in the big conference room, I did not really have a good appreciation of that. And then that changed the analysis and then Mr. Egee contacted their home office in Philadelphia and there [were] some phone calls back and forth, and then there [were] some additional monies that were released.

(*Id.* at 11–12).

¶ 6 Because of the difficulties faced by Mrs. Urmann as a consequence of her husband's injuries, Spilka raised its settlement offer to $300,000, with the intent that the majority of these monies would compensate Mrs. Urmann for her loss of consortium. (*Id.* at 12, 21–22, 25, 30–31, 33). The final offer, accepted by the Urmanns, was $250,000 for Mrs. Urmann's claims, and $50,000 for Mr. Urmann's claims. (*Id.* at 21). Because of the unusual nature of the settlement, with the spouse of the injured party receiving the lion's share of the recovery, Judge Murphy recommended obtaining court approval of the settlement agreement. (*Id.* at 32–33).

¶ 7 The Urmanns' adult daughter, Christine Aiello, testified at the hearing that her father had changed from being a person who took care of everything to one who was incapable of assuming his daily responsibilities, thus necessitating that her mother assume responsibility for them. In fact, Ms. Aiello testified that Mrs. Urmann "had to become more of a mother than a wife" to her husband as a result of the accident-related changes he

---

**2.** The spelling of this insurance adjuster's name may be phonetic.

**3.** Deposition testimony from Mr. Urmann's treating physicians indicated that as a result of his work-related injuries, he suffered from a major depressive disorder, an organic mood

disorder, and a cognitive disorder with impaired intellectual functioning. (*See, generally,* Deposition Testimony of Swami Nathan, M.D., dated May 11, 2001, and Deposition Testimony of Craig Taylor, M.D., dated August 20, 2001).

suffered. (*Id.* at 38). She further testified that her parents no longer entertained as they had prior to the accident, that her father had become short-tempered, and that her father had lost understanding of certain basic concepts, including concepts of "danger" and "being able to tell right from wrong." (*Id.* at 40). Further, Mr. Urmann had become intolerant of noise, particularly the noise typically made by children, and he would order his grandchildren away when he became irritated by their noise and play. (*Id.* at 44).

¶ 8 Finally, Mrs. Urmann testified regarding the change her life has undergone since the accident-related injuries altered her husband's abilities and personality. Mrs. Urmann testified that her husband has become "completely different," a person who is now very quiet and who can not tolerate the company of children for any length of time, although he initially enjoys their company. (*Id.* at 49). Mr. Urmann went from being a very active man to one who now "does nothing" and "sleeps most of the day." (*Id.* at 50). The Urmanns' social life has also changed greatly, as they no longer go out very much. Mrs. Urmann attributes this circumstance to Mr. Urmann's discomfort with his stuttering speech and forgetfulness. (*Id.* at 50–51). Further, Mr. Urmann has become nasty and very short with his temper, unlike his personality before the accident. (*Id.* at 51). Mr. Urmann, however, does not realize how much he has changed for the worse and, although he senses that things are different, he does not appear to relate any change to the accident, and is unaware of the severity of the transformation he has undergone. (*Id.* at 51–52). His depression has become progressively worse in the years since the accident. (*Id.* at 57).

¶ 9 Mrs. Urmann also testified that she has to spend a great deal of time and effort simply caring for her husband. Mrs. Urmann must prepare and monitor his daily medication of eighteen pills. (*Id.* at 50, 59–62). Mrs. Urmann must remind her husband to take a bath and tell him what to wear. (*Id.* at 65, 62). Mrs. Urmann is her husband's sole caregiver, and she is unable to leave him alone for any length of time without having to have someone check on him. (*Id.* at 59, 64).

¶ 10 Mrs. Urmann also testified that her life with Mr. Urmann has become burdensome in other ways. Mr. Urmann is no longer willing to go on vacation. (*Id.* at 55). Mrs. Urmann's youngest grandchild no longer likes to come to the house, whereas prior to the accident, she visited every day. (*Id.* at 56). Mrs. Urmann is no longer able to participate in any outside activities. (*Id.*). She testified: "I don't have a life. I mean, he doesn't, but he doesn't realize it. But I know I am not free to do anything." (*Id.* at 66).

¶ 11 At the close of the evidence, President Judge Cleland made his ruling. In making his factual findings and legal conclusions, he noted the legal sensitivity of the issue before him: "[I]t is the responsibility of the Court to make sure that the allocation [of the settlement] . . . is a fair apportionment based on the facts of the case, as distinguished from whether the apportionment is allocated not based on the facts but designed only to maximize the net recovery to [Appellees] at the expense of [Appellant's workers' compensation] subrogation lien." (*Id.* at 66–67). President Judge Cleland then reviewed the evidence, finding "apt" Mr. Sciarrino's analogy of Mr. Urmann's condition to that of an Alzheimer's sufferer, each having little understanding of the degree of change that has occurred, particularly the change occurring in the lives of those loved ones who must care for the sufferer. (*Id.* at 67). The judge further concluded that

when a marital relationship "is not merely damaged, but is fundamentally destroyed, then the standard rules of 15, 20, 30 percent [of the personal injury award or settlement for loss of consortium claims] seem to me to be inapplicable." (*Id.*). President Judge Cleland then found as a fact that the settlement apportionment between Mr. Urmann's personal injury claims and Mrs. Urmann's loss of consortium claims "is based on a good faith attempt to apportion the claim based on the facts, rather than on a motivation intended to, and designed to, or motivated to eliminate or reduce unconscionably, a subrogation lien." (*Id.* at 68). President Judge Cleland accordingly approved the settlement agreement.

¶ 12 Appellant filed a timely appeal, presenting the following five issues for our review:

I. Ha[ve Appellees] failed to meet the burden of persuasion for a reasonable apportionment of a civil action?

II. Was apportionment improperly based upon [Appellees'] unsupported declaration of the value of the spousal claim?

III. Is it erroneous as a matter of law that the declared value of the spousal claim was not subject to the same compromise as [Appellee Urmann's] claim?

IV. Does approval of [Appellees'] apportionment violate the public policy considerations regarding the potential for abuse in the structuring of civil action settlements?

V. Is approval of [Appellees'] unilateral apportionment is [sic] contrary to the

absolute right of subrogation of the insurer?

(Appellant's Brief at 4).

¶ 13 Our standard of review of a trial court's review of a settlement agreement is plenary as to questions of law. *Miller v. Ginsberg*, 874 A.2d 93, 99 (Pa.Super.2005) (quoting *Felix v. Giuseppe Kitchens & Baths, Inc.*, 848 A.2d 943, 947 (Pa.Super.2004)). We are, however, bound by those factual findings that are supported by competent evidence. *Felix, supra.* The evidence must be viewed in the light most favorable to the prevailing party. *Id.* Thus, we will overturn the trial court's decision only when the court's factual findings are contrary to the weight of the evidence or when its legal conclusions are erroneous. *Miller, supra.*

¶ 14 Further, with respect to issues regarding the proper amount of damages, we again defer to the fact-finder, which assesses the credibility and weight of the evidence. *Omicron Systems, Inc. v. Weiner*, 860 A.2d 554, 564 (Pa.Super.2004). While the fact-finder may not engage in sheer conjecture or guesswork, it may use a measure of speculation in assessing just and reasonable damages, relying on inferential as well as direct and positive proof. *Id.* at 565. We also note that "damages for loss of consortium have no market value, and the amount awarded for loss of consortium is left to the sound judgment and common sense" of the fact-finder. *Mendralla v. Weaver Corp.*, 703 A.2d 480, 488, n. 4 (Pa.Super.1997) (quoting *Nudelman v. Gilbride*, 436 Pa.Super. 44, 647 A.2d 233, 239 (1994)).

¶ 15 Appellant's first two arguments essentially challenge the sufficiency of the evidence supporting the trial court's order.[4] We restate Appellant's arguments

---

4. Appellant first two arguments are: (1) the Urmanns "failed to meet [their] burden of persuasion for a reasonable apportionment;" and (2) the "apportionment was based upon [the Urmanns'] unsupported declaration of the value of the spousal claim." (Appellant's Brief at 9 and 15, respectively).

in order to place them within our proper standard of review and accord them meaningful review. Generally, Appellant argues that the Urmanns failed to present any evidence regarding the monetary value of Mrs. Urmann's loss of consortium claims, and that the burden of persuasion inappropriately shifted to Appellant and away from the Urmanns at some undefined moment in the proceedings. Appellant also argues, correctly, that there was no agreement between the Urmanns and Appellant regarding apportionment. However, the argument that there was no adjudication determining the appropriate apportionment of the settlement between physical injuries and loss of consortium is untrue.

¶ 16 Appellant argues that the Urmanns' "unilateral" apportionment of settlement funds should act to subject the entire settlement amount to Appellant's subrogation claim pursuant to *Pendleton v. Workmen's Compensation Appeal Board (Congoleum Corp.)*, 155 Pa.Cmwlth.440, 625 A.2d 187 (1993), and its progeny. Appellant then engages in what appears to be an argument regarding the weight of the evidence. However, the "evidence" discussed by Appellant is not that which was submitted at the evidentiary hearing, with the exception of select portions of Mr. Sciarrino's testimony, but rather was deposition testimony of a forensic economist and some medical witnesses discussing the severity of Mr. Urmann's physical and mental injuries. (Appellant's Brief at 16–19). Without any citation to authority, Appellant contends that the weight of this "evidence" does not support an apportionment bestowing 83.33% of the recovery amount to Mrs. Urmann's loss of consortium claims. Again without citation to any authority or source, Appellant remarks that Mrs. Urmann has suffered from "unfortunate, but not unusual circumstances," and thus the apportionment of a large share of the settlement funds to her loss of consortium claims was unwarranted. (*Id.* at 19, 625 A.2d 187).

¶ 17 There are numerous problems with Appellant's arguments, principally the fact that they virtually ignore the existence of the trial court's evidentiary hearing and resulting findings of facts. Appellant was, indeed, a full participant in that evidentiary hearing. Thus, Appellant's citation to *Pendleton, supra*, as controlling authority is wholly inapposite. *Pendleton* holds that absent an injured worker's agreement with a third-party tortfeasor concerning the apportionment of a settlement between the worker's injuries and the spouse's loss of consortium claim, or absent an adjudication determining such apportionment, the entire settlement amount is subject to the employer/insurer's subrogation rights under the Act. *Id.* at 189. In the case *sub judice*, there was both an agreement with the third-party tort-feasor and an adjudication reviewing that agreement by the trial court. Therefore, Appellant's argument that the apportionment of the settlement funds between physical injuries and loss of consortium claims was made "unilaterally" by the Urmanns is beyond disingenuous—it is flatly wrong, and *Pendleton* simply does not apply to the clear procedural facts of this case.

¶ 18 Turning to the evidentiary hearing itself, we note that the record of this proceeding shows that (1) the Urmanns presented three witnesses; (2) Appellant did not object to the relevancy of these witnesses' testimony; (3) the trial court never shifted the burden of proof or persuasion to Appellant; and (4) Appellant chose not to offer any evidence of its own in rebuttal to the Urmanns' evidence. Consequently, Appellant is incorrect when it argues that *it* sustained the burden below, or that the weight of its "evidence" mandated that the trial court not approve the settlement

agreement. Appellant never presented any evidence. Rather, it simply referenced in the argument portion of its brief certain deposition testimony of witnesses *who did not testify at the evidentiary hearing.* Had Appellant felt their testimony was relevant to the proceedings, it could have called these witnesses in defense, or submitted other evidence. Appellant, however, chose to rest after the presentation of the Urmanns' case. (N.T. at 66, 68).

■ ¶ 19 Regarding Appellant's argument that the Urmanns failed to introduce economic evidence in support of their petition to approve the settlement agreement, we again note the well-established principle that "damages for loss of consortium have no market value, and the amount awarded for loss of consortium is left to the sound judgment and common sense" of the fact-finder. *Mendralla, supra* at 488 n. 4. Therefore, we conclude that the trial court did not err or abuse its discretion when it determined that the Urmanns had presented sufficient "non-economic" evidence in support of their petition to approve the settlement agreement, as economic evidence is not required to prove the value of a loss of consortium claim.

¶ 20 We further note that in the case *sub judice,* the trial court found and concluded:

> Here, the true victim, the one who is all too painfully aware of the change in her life's circumstances, is Mary Lee Urmann. While it was John Urmann who suffered the physical injuries, he has largely recovered from those. It is the behavioral changes caused by his brain injuries that continue. While Mr. Urmann, thankfully, is, in large measure, oblivious or unaware of his limitations, those limitations are painfully apparent to his wife. She is the one who each day attempts to create and maintain a loving

> marital relationship[,] even though the person to whom she was married before the accident is a changed and different person. I found very credible her testimony concerning the effects the changes in her husband have had on her life and how they have affected, if not destroyed, their marital relationship. . . . Based on the testimony I heard, testimony I found to be credible, if this is not a consortium claim worthy of a significant allocation of the settlement proceeds to a long-suffering wife, then no claim can be considered worthy.

(Trial Court Opinion, dated January 21, 2005, at 2–3).

¶ 21 Appellant has not challenged these factual findings. They are, therefore, conclusive on appeal, and we further note that the competent evidence of record amply supports them. Clearly, the trial court's decision was based on sufficient, competent evidence.

■ ¶ 22 In its final three arguments, Appellant contends that Mrs. Urmann's unusually large loss of consortium award violates both law and public policy. Appellant's argument, to use the words of the trial court, is that a consortium claim is never "worthy of a significant allocation of . . . settlement proceeds," at least where there exists an insurer/employer with subrogation rights under the Act. We disagree.

¶ 23 The first of Appellant's legal arguments asserts that the "value of [Mrs. Urmann's] claim was not subject to the same [alleged] compromise as [Mr. Urmann's] claim." (Appellant's Brief at 21). Preliminarily, we note that throughout this argument, Appellant once again repeats the assertion that there was no adjudication of the reasonableness of the apportionment of the settlement fund. We highlight the following from Appellant's brief:

In the instant case, [Mr. Urmann] and [Spilka] did not seek the sound judgment and common sense of a jury[;] rather the parties assigned values to [Mr. and Mrs. Urmann's respective] claims.

\*  \*  \*  \*  \*  \*

There *was no factual or evidentiary basis* to support an apportionment of a $300,000.00 settlement on the basis of $250,000.00 (83.33%) to the uninjured spouse and only $50,000.00 (16.67%) to the injured spouse. This *abusive* and *arbitrary* apportionment must properly be set aside.

\*  \*  \*  \*  \*  \*

Recall that [Mr. Urmann] and [Spilka] did not execute any settlement agreements or releases. There were no documents executed to attribute $250,000.00 to the spousal claim and $50,000.00 to [Mr. Urmann's] claim. *Where there has been no adjudication on the merits* and no agreement [between Mr. Urmann] and [Appellant] concerning a consortium claim, there is no basis for excluding [from Appellant's] subrogation, an amount attributable to the consortium claim. *This is particularly true where the record provides no basis to do so, and where [Mr. Urmann] has rested solely upon [his] own unsupported unilateral allocation of the settlement proceeds.*

(Appellant's Brief at 23–24; emphases supplied).

¶ 24 It is difficult to understand Appellant's reasoning in making these false statements. Inherent in these remarks is an expression of low regard, not only for this Court, which is quite capable of reading a record and discovering that the procedural history of a case is not what Appellant represents it to be, but especially for the trial court. Indeed, throughout its brief, Appellant appears to take the position that nothing of consequence happened before the trial court. Yet we have before us an appeal from the trial court's *adjudication, based on facts found following an evidentiary hearing,* on a petition to the court to approve a *settlement agreement* that apportions the respective claims of Mr. and Mrs. Urmann. Indeed, the whole point of the petition to approve the settlement agreement was to obtain court review of what the parties acknowledged was an unusual apportionment, as the settlement *amount* does not appear to be an issue for any party, including Appellant. For Appellant to continue to assert that the apportionment, which was in fact approved by the trial court following an evidentiary hearing devoted to the very issue of the reasonableness of the apportionment aspect of the settlement agreement, was made "unilaterally" by Mr. Urmann is unfounded.

¶ 25 Amidst Appellant's misplaced assertions lies a legal argument. That argument is that Mrs. Urmann's loss of consortium claims are subject to the same "compromise" as are Mr. Urmann's tort claims. In turn, this argument is based on the supposition that because Mr. Urmann's claims had been purportedly "reduced" in value, then Mrs. Urmann's loss of consortium claim, being derivative of her husband's injuries, should have been reduced as well. (*See* Appellant's Brief at 23). The difficulties with this argument are several.

¶ 26 First, there is *no evidence* that Mr. Urmann's claim has been "reduced" or "compromised." Appellant does not actually explain the alleged reduction, nor does it explain what it means by "compromised." In other portions of the brief, Appellant highlights Mr. Sciarrino's testimony that he calculated Mr. Urmann's damages in the range of $750,000 to

$1,250,000, which perhaps provides a clue to Appellant's argument. (Appellant's Brief at 18). Mr. Sciarrino's damage estimate, however, did not reflect the percentage of Spilka's liability for such damages. The *evidence* shows only that Spilka's initial settlement offer was $25,000. Mr. Sciarrino thereafter valued the case at between $75,000 and $125,000 for settlement purposes, which he did not break down into components for Mr. Urmann's injuries and Mrs. Urmann's loss of consortium injuries at the time he arrived at this valuation. Following his meeting with the Urmanns, however, Mr. Sciarrino determined that the unusual facts warranted a substantial increase for a settlement recovery, based solely on the consortium losses sustained by Mrs. Urmann. Thus, the *evidence* fails to show that Mr. Urmann's claims had been reduced in any fashion.

¶ 27 Second, Appellant ignores the well-established principle that a loss of consortium claim, although derivative of the other spouse's physical injuries, "is a separate and distinct cause of action." *Darr Construction Co. v. Workmen's Compensation Appeal Board (Walker)*, 552 Pa. 400, 408, 715 A.2d 1075, 1080 (1998). Indeed, the very point of the evidentiary hearing before the trial court was to determine the reasonableness of the apportionment of settlement funds for Mrs. Urmann's separate and distinct cause of action. The case law cited by Appellant stands for the proposition that deficiencies in the physically-injured spouse's evidence in a tort action apply with equal vigor to the other spouse's loss of consortium claims.[5] Here, however, there was no finding of deficiencies in Mr. Urmann's evidence in support of his tort action. Therefore, Appellant's third argument is wholly without merit.

¶ 28 Appellant next argues that the trial court's approval of the settlement agreement violates public policy considerations designed to guard against the potential for abuse in the structuring of settlement agreements where there is apportionment between direct tort claims and claims for loss of consortium. This argument is based on remarks made by our Supreme Court in *Darr Construction, supra*. In that case, our Supreme Court held that an employer/insurer does not have a subrogation claim against loss of consortium settlements or awards under Section 319 of the Act, as loss of consortium claims are separate and independent from the injured worker's third-party tort action. *Id.* at 408, 715 A.2d at 1080. The Court then stated:

> We recognize that a potential for abuse exists in the structuring of loss of consortium settlements between a claimant and a third party tortfeasor due to the lack of participation by the employer in the proceeding. A claimant would have the opportunity to shield his recovery from the employer's subrogation interest by fraudulently attributing an unwarranted amount of the damages to the spouse's claim for loss of consortium. *Fear of abuse, however, is an impermissible basis upon which to require the forfeiture of a spouse's valid recovery. In the event the settlement is unreasonably apportioned, an employer may always seek recourse in the court of common pleas.*

---

5. *See Beswick v. Maguire,* 748 A.2d 701, 705 (Pa.Super.2000) (holding that a loss of consortium claim is subject to the same jury compromise of claimed damages based on a lack of evidentiary integrity as is the claim of the physically-injured spouse); and *Scattare-gia v. Shin Shen Wu,* 343 Pa.Super. 452, 495 A.2d 552, 553–54 (1985) (holding that a loss of consortium claim should be reduced by the percentage of comparative negligence attributable to the physically-injured spouse).

*Id.* at 411, 715 A.2d at 1081; (emphasis supplied).

¶ 29 Appellant's argument focuses upon the first two sentences of the above-quoted passage, while ignoring the last two sentences. Indeed, Appellant participated in an evidentiary hearing whose primary purpose was specifically to determine the issue of whether the settlement agreement between the Urmanns and Spilka was fraudulently attributing an unwarranted amount of the damages to Mrs. Urmann's claims for loss of consortium. Once again, Appellant ignores that the evidentiary hearing took place, and asserts that abuse is demonstrated *ipso facto* in that it will recoup only $31,946 from Mr. Urmann's recovery under the approved settlement agreement, as opposed to recouping $91,344 had Mr. Urmann received $250,000 in settlement and Mrs. Urmann $50,000. Appellant, however, cites no authority mandating that loss of consortium claims be limited to any certain percentage of recovery—because there are none.

¶ 30 We know of no authority that permits us to simply switch the amounts apportioned under a settlement agreement approved by the court below, as Appellant has requested that we do here.[6] However, we are quite certain that there is no public policy imperative that the subrogation interests of an employer/insurer under the Act be maximized at all costs, in disregard of the well-supported factual findings of the trial court. Indeed, it is well established that the Act is remedial in nature, designed to benefit injured workers in this Commonwealth, and, as such, is to be liberally construed to effectuate its humanitarian purposes. *Harper & Collins v. Workmen's Compensation Appeal Board*

*(Brown),* 543 Pa. 484, 490, 672 A.2d 1319, 1321 (1996).

¶ 31 Here, the trial court expressed its keen recognition of the problematic nature of structuring settlement agreements where a large portion of the settlement funds are attributed to loss of consortium claims and the employer/insurer enjoys a subrogation right limited to the injured worker's recovery. As the trial court observed:

[I]t is the responsibility of the Court to make sure that the allocation is ... a fair apportionment based on the facts of the case, as distinguished from whether the apportionment is allocated not based on the facts but designed only to maximize the net recovery to [the Urmanns] at the expense of the [workers' compensation] subrogation lien.

(N.T. at 66–67).

¶ 32 After reviewing the evidence and making its credibility determinations and factual findings, the trial court concluded that in extreme and unusual circumstances, such as those established at the hearing, the standard practice of relegating loss of consortium claims to a minor percentage of the recovery would be inappropriate. Finding that the apportionment in the settlement agreement was "based on a good faith attempt to apportion the claim based on the facts, rather than on a motivation intended to, and designed to, or motivated to eliminate or reduce ... [the] subrogation lien," the court determined that approval of the settlement agreement was warranted. (*Id.* at 68, 672 A.2d 1319).

¶ 33 It is more than apparent that the trial court was mindful of the concerns expressed by our Supreme Court in *Darr*

---

**6.** At other times in its brief, Appellant takes the position that the whole of the Urmanns' settlement is subject to its subrogation lien.

*Construction, supra,* and acted carefully and with deliberation to ensure that the Urmanns were not "fraudulently attributing an unwarranted amount of the damages to the spouse's claim for loss of consortium." *Id.* at 411, 715 A.2d at 1081. Under these circumstances, there can be no question that neither law nor public policy was violated by the trial court's approval of the settlement agreement.[7]

¶ 34 Finally, Appellant argues that the trial court's approval of the settlement agreement was "contrary to [Appellant's] absolute right of subrogation." (Appellant's Brief at 29). This argument is, once again, based on Appellant's totally fallacious and fantastic assertions that there was no adjudication as to the reasonableness of the apportionment devised in the settlement agreement, and that the apportionment was simply made "unilaterally" by the Urmanns. (*See id.* at 29–30, 715 A.2d 1075). Beyond that, Appellant simply cites case law recognizing the employer/insurer's right of subrogation set forth in Section 319 of the Act.

¶ 35 No one has questioned Appellant's right to subrogation against Mr. Urmann's recovery in his third-party tortfeasor action. Appellant, however, has failed to cite any authority precluding an atypically large recovery for a loss of consortium claim derivative of the underlying third-party action where the unusual facts support such apportionment. Further, Appellant has failed to actually show, in accordance with established authority, that the trial court's factual findings were not based on, or were clearly contrary to the weight of the evidence presented. Quite simply, there is no basis to conclude that the trial court's approval of the settlement agreement was contrary to Section 319 of the Act or to Appellant's right of subrogation provided therein.

¶ 36 For all of the above reasons, we hold that the trial court acted properly in approving the settlement agreement. Accordingly, we affirm the trial court's order.

¶ 37 Order affirmed.

---

7. We would also note that our courts recognize a strong public policy *favoring* settlements and discouraging litigation. *Darr Construction, supra* at 411, 715 A.2d at 1081; *Storms v. O'Malley,* 779 A.2d 548, 557 (Pa.Super.2001). *These* public policy concerns were certainly furthered by the trial court's decision.