Jeffrey TINDALL and Silvia Tindall, Husband and Wife,

v.

Brad S. FRIEDMAN, D.O., and Mark Schweitzer, M.D. and Jefferson Imaging and Thomas Jefferson University Hospital and Jefferson Health System,

Appeal of: Mark Schweitzer, M.D. Appellant.

Jeffrey Tindall and Silvia Tindall, Husband and Wife,

v.

Brad S. Friedman, D.O., and Mark Schweitzer, M.D. and Jefferson Imaging and Thomas Jefferson University Hospital and Jefferson Health System,

Appeal of: Brad S. Friedman, D.O. Appellant.

Jeffrey Tindall and Silvia Tindall,

v.

Brad S. Friedman, D.O., and Mark Schweitzer, M.D. and Jefferson Imaging

Appeal of: Jefferson Imaging, Appellant.

Jeffrey Tindall and Silvia Tindall,

v.

Brad S. Friedman, D.O., and Mark Schweitzer, M.D., and Jefferson Imaging and Thomas Jefferson University Hospital and Jefferson Health System, Appellees.

Superior Court of Pennsylvania.

Argued Feb. 5, 2008.
Filed March 24, 2009.
Reargument Denied June 1, 2009.

Paul E. Peel, Plymouth Meeting, for Schweitzer.

Edward M. Koch, Berwyn, for Jefferson.

James W. Gicking, Philadelphia, for Friedman.

David A. Yanoff, Philadelphia, for Tindall.

BEFORE: BOWES, SHOGAN and FITZGERALD *, JJ.

OPINION BY BOWES, J.:

¶ 1 Dr. Brad S. Friedman, Dr. Mark Schweitzer, and Jefferson Imaging have filed separate appeals from the judgment entered on a jury award in favor of Jeffrey and Silvia Tindall, and the Tindalls have appealed the trial court's post-trial entry of judgment notwithstanding the verdict ("n.o.v.") in favor of Jefferson Imaging. We reverse the entry of judgment n.o.v. in favor of Jefferson Imaging and remand for reinstatement of the judgment against that company. We affirm the jury award in favor of the Tindalls, but remand for recalculation of delay damages imposed on that verdict.[1]

¶ 2 The facts underlying the present cause of action, viewed in the light most favorable to the Tindalls as verdict winners, are as follows. In early 1997, when he was twenty-eight years old, Mr. Tindall occasionally began to experience problems with his left knee in that when he stood, the knee failed to bend easily, and when it did bend, it would apparently dislocate and then return to its natural position. On April 15, 1997, he was weeding his yard on a four-foot retaining wall and attempted to stand when his knee locked, and he fell from the wall onto grass. Mr. Tindall experienced pain in his knee and scheduled an appointment for the following day with his family doctor, Dr. Friedman.

¶ 3 Dr. Friedman diagnosed Mr. Tindall with a strain or sprain but sent him for an x-ray for confirmation. The radiologist who read the x-ray stated that the x-ray was consistent with a diagnosis of a strain or sprain resulting from the fall, but he also indicated that the x-ray revealed the existence of an abnormality on the outside of the left knee that was unrelated to the fall. The radiologist concluded that the abnormality could be classified as either a hematoma, which is a completely benign condition, or a neoplasm, which is an abnormal growth of cells. A neoplasm can consist of cancerous cells. In his written report, the radiologist recommended that Mr. Tindall undergo an MRI solely to eliminate the possibility that the abnormality was malignant, and he also telephoned Dr. Friedman's office to ensure that the MRI would be conducted due to the possibility that the abnormality was cancer.

¶ 4 Dr. Friedman ordered the recommended MRI from Jefferson Imaging. In written instructions regarding the purpose for the MRI, Dr. Friedman specifically noted that the MRI was to be conducted to determine whether the abnormality on Mr. Tindall's knee was a calcified hematoma or a neoplasm. The record establishes that to a physician, those instructions would be interpreted as a direction to perform the MRI to eliminate the possibility that the abnormality on Mr. Tindall's knee was a cancer. Mr. Tindall underwent his MRI at Jefferson Imaging on April 23, 1997, and Dr. Schweitzer interpreted it in a report issued on April 25, 1997.

¶ 5 Dr. Schweitzer stated at trial that he did not receive Dr. Friedman's written instructions regarding the reason the MRI had been requested and that he was under the impression that he was interpreting the MRI to determine the nature of a twisting injury that Mr. Tindall had sustained to the left knee. Thus, Dr. Schweitzer read the MRI in accordance with the protocol for determining the type of twisting injury the left knee had sustained. Dr.

* Former Justice specially assigned to the Superior Court.

1. The case was re-assigned to the present panel after the first panel was unable to reach a decision, and was re-assigned to this author in October 2008.

Schweitzer also testified that if he had received Dr. Friedman's written instructions, he would have told Mr. Tindall to return to Jefferson Imaging for performance of a different set of MRI studies that were necessary for Dr. Schweitzer to properly diagnose the abnormality. Those studies would have been conducted and interpreted under the tumor protocol, which would apply for determining if the abnormality on the left knee was a cancerous growth. Dr. Schweitzer said that if the MRI had been performed and evaluated in accordance with the tumor protocol, the abnormality would have been diagnosed as malignant in April 1997. Since the incorrect protocol was utilized, Dr. Schweitzer did not determine if the abnormality on the left knee, which was unrelated to Mr. Tindall's April 15, 1997 fall, was malignant.

¶ 6 The April 25, 1997 report issued by Dr. Schweitzer and sent to Dr. Friedman provided as follows (emphasis added):

There is edema at the insertion site of the gastrocnemus muscle consistent with muscle injury. On the clinical data form, it is noted that the patient had an abnormal outside radiograph that apparently noted a calcific density along the lateral border of the distal femur. The edema at the insertion of the gastrocnemus may suggest the **possibility** of a cortical desmoid accounting for the radiographic abnormality. Follow up radiographs could be performed if clinically indicated to further characterize this finding.

¶ 7 Thus, the report noted that the edema suggested the possibility of a cortical desmoid, which would account for the abnormality. Cancer was not discussed in the report.

¶ 8 On March 16, 1998, Mr. Tindall, who never was informed about the abnormality on his knee or that it possibly was malignant, returned to Dr. Friedman complaining that his knee was still causing him problems. Mr. Tindall reported that the knee continued to lock and then momentarily dislocate and that it was also painful. On April 13, 1999, Mr. Tindall presented to Dr. Friedman with more frequent and severe pain in the knee as well as continued locking and swelling. He complained of imbalance and also displayed unexplained weight loss.

¶ 9 On June 2, 1999, Mr. Tindall, who continued to have his April 1999 symptoms, complained to Dr. Friedman of the additional symptom of energy loss. Later that month, Mr. Tindall asked for a referral, and Dr. Friedman sent him to an orthopedic specialist, Dr. George Stollsteimer. Dr. Stollsteimer saw Mr. Tindall in July 1999, and immediately ordered radiological studies. Following receipt of those studies, Dr. Stollsteimer promptly referred Mr. Tindall to an orthopedic oncologist, a doctor specializing in treatment of bone cancer. In August 1999, two and one-half years after the April 23, 1997 MRI, Mr. Tindall's bone cancer was diagnosed.

¶ 10 Due to the delay in diagnosis, Mr. Tindall's cancer increased in size and dedifferentiated from a low-grade cancer to a more aggressive, high-grade cancer. Expert testimony presented by the Tindalls indicated that the cancer had probably dedifferentiated in the year prior to its diagnosis. Since his cancer was high-grade rather than low-grade, Mr. Tindall's treatment, because it included chemotherapy, was significantly more debilitating. Although he is now cancer-free, he runs a significantly increased risk of reoccurrence, metastasis, and death than he would have had if the condition had been diagnosed in 1997. High-grade cancers have a ninety percent chance of recurrence within a twelve-year period and of causing death. Thus, Mr. Tindall must undergo cancer

surveillance for the remainder of his life and cannot secure life insurance.

¶ 11 Mr. Tindall was rendered sterile due to the chemotherapy. He placed his sperm in a sperm bank, but in order to conceive, Mrs. Tindall, who was pregnant at trial, underwent *in vitro* fertilization, which is costly and medically burdensome. She will have to do so again in order to have another child. If Mr. Tindall had been diagnosed in April 1997, he would have been treated with surgery alone, had an excellent prognosis for a cure, and had an extremely low chance of recurrence or metastasis.

¶ 12 The Tindalls instituted this medical malpractice action against Dr. Friedman, Dr. Schweitzer, Jefferson Imaging, Jefferson University Hospital, and Jefferson Health System alleging that they were negligent for failing to promptly diagnose the cancerous tumor on Mr. Tindall's left knee. The trial court granted summary judgment to Jefferson University Hospital and Jefferson Health System. As to Jefferson Imaging, the Tindalls had pleaded a claim of corporate negligence and also averred that it was liable because Dr. Schweitzer was operating as its agent when he interpreted the MRI. Jefferson Imaging subsequently was granted summary judgment on the corporate negligence cause of action, and at trial, its liability was predicated solely on its status as principal to Dr. Schweitzer.

¶ 13 The case proceeded to a jury trial on April 26, 2004, and on May 5, 2004, the jury returned a verdict finding that Dr. Schweitzer and Dr. Friedman were equally liable for the Tindalls' injuries and that Dr. Schweitzer was Jefferson Imaging's agent when he read the April 23, 1997 MRI. It awarded Mr. Tindall $2,500,000 and Mrs. Tindall $1,000,000 in damages. The verdict was molded to reflect the imposition of delay damages, and on November 3, 2004, judgment in the amount of $3,801,097 was entered in favor of the Tindalls and against Dr. Schweitzer, Dr. Friedman, and Jefferson Imaging.

¶ 14 Those three defendants filed the appeals at 3390 EDA 2004, 3391 EDA 2004, and 3433 EDA 2004 from the November 3, 2004 judgment entered on the verdict. Following the filing of those appeals, the trial court issued an opinion and therein concluded that Jefferson Imaging was entitled to judgment n.o.v. because its agent, Dr. Schweitzer, had been released during the course of trial. Since appeals had been filed, the trial court did not have jurisdiction to enter judgment in favor of Jefferson Imaging. 42 Pa.C.S. § 5505. Therefore, on November 17, 2005, we granted Jefferson Imaging's motion for remand for grant of judgment n.o.v. in its favor, without prejudice to the Tindalls' right to appeal from that judgment. Judgment n.o.v. was entered in favor of Jefferson Imaging, and the Tindalls then filed the appeal at 3494 EDA 2005. The four appeals were consolidated for purposes of disposition.

█ ¶ 15 We first address the issue presented by the Tindalls at 3494 EDA 2005. They claim that judgment n.o.v. was improperly entered in favor of Jefferson Imaging. As noted, judgment n.o.v. was premised upon a finding by the trial court that Dr. Schweitzer had been released during the course of trial. Since Dr. Schweitzer had been released, the trial court held that Jefferson Imaging, as his principal, also was released. *See Mamalis v. Atlas Van Lines, Inc.*, 522 Pa. 214, 560 A.2d 1380 (1989).

¶ 16 The following facts are pertinent to our resolution of this issue. Prior to submission of the case to the jury, in exchange for the $400,000 limit of Dr. Schweitzer's primary medical malpractice insurance, the Tindalls agreed not to execute against

Dr. Schweitzer's personal assets. The agreement was entered on the record:

> [Tindalls' Counsel:] We have come to an understanding that $400,000 will be paid to my clients by Dr. Schweitzer's primary carrier, PMSLIC. That payment will be made within 30 days irrespective of the outcome of the trial.
>
> In exchange my clients agree to withdraw their motion to amend the complaint to allege punitive damage.
>
> They further agree not to go after or pursue Dr. Schweitzer's personal assets in the event of an excess verdict.
>
> They agree further not to pursue bad faith claims against Dr. Schweitzer's primary carrier, PMSLIC.
>
> **My clients are not releasing Dr. Schweitzer nor are they agreeing to indemnify or hold him harmless with respect to any claims that may be pursued against him by the other defendants.**
>
> **My clients are not waiving any right to continue this case against any defendant in this case or to collect any primary policies, excess policies of any defendant in this case.**

N.T. Trial, 5/3/04, at 99–100 (emphasis added). Even though Dr. Schweitzer's personal assets were immune, Dr. Schweitzer still had an additional $800,000 in coverage pursuant to the Medical Care Availability and Reduction of Error Act ("MCARE"), 40 P.S. §§ 1303.101–1105, that was not subject to the stipulation.

¶ 17 It is "well-established that a release is the giving up or the abandoning of a claim or right to the person against whom the claim exists or the right is to be enforced or exercised[.]" *Complaint of Bankers Trust Co.,* 752 F.2d 874, 883 (3rd Cir.1984); *see also Blanchard v. Wilt,* 410 Pa. 356, 188 A.2d 722, 724 (1963) (agreement to hold party harmless "from any further liability in connection with damages" caused by fire that was subject mat-

ter of the lawsuit was construed as a release since it was received in exchange for consideration and discharged party from liability in action). Case law is also clear that the release of an agent will absolve the agent's principal from vicarious liability for the actions of the agent. *Mamalis, supra.*

¶ 18 The operative inquiry in this case is whether the stipulation in question served to release the agent, Dr. Schweitzer, which would, in turn, release the principal, Jefferson Imaging, from its vicarious liability.

> The Pennsylvania rule on stipulations is long-settled: parties may bind themselves, even by a statement made in court, on matters relating to individual rights and obligations, so long as their stipulations do not affect the court's jurisdiction or due order of business.... The courts employ a contracts-law analysis to interpret stipulations, so that the intent of the parties is controlling.

*Tyler v. King,* 344 Pa.Super. 78, 496 A.2d 16, 21 (1985).

¶ 19 The proper construction of a contract is a question of law, and our standard of review is plenary. *Patriot Commercial Leasing Co., Inc. v. Kremer Restaurant,* 915 A.2d 647 (Pa.Super.2006). A cornerstone principle of contract interpretation provides that where the words of the document are clear and unambiguous, we must "give effect" to the language. *Standard Venetian Blind Co. v. American Empire Ins. Co.,* 503 Pa. 300, 469 A.2d 563, 566 (1983); *see also Mace v. Atlantic Refining Marketing Corp.,* 567 Pa. 71, 785 A.2d 491, 496 (2001).

¶ 20 In this case, the contract clearly and unambiguously provided that it was not a full release; it was an agreement not to execute against the personal assets of Dr. Schweitzer. Thus, it was a partial release as to Dr. Schweitzer's personal assets. However, since Dr. Schweitzer

continued to possess MCARE coverage that remained subject to liability in this action, the Tindalls did not give up or abandon their claim against Dr. Schweitzer.

¶ 21 The actions of both parties following entry of the stipulation substantiate that Dr. Schweitzer was not released. The Tindalls actively pursued their negligence claim against Dr. Schweitzer in order to collect the MCARE coverage that remained subject to liability, and Dr. Schweitzer defended himself at trial and continues to contest the verdict on appeal. It is an established principle of contract construction that "subsequent conduct of the parties, course of performance, is an aid to interpretation." *Herzog v. Herzog,* 887 A.2d 313, 316 (Pa.Super.2005). Thus, when contracting parties perform under the contract, "their performance manifests a common manifestation of their understanding of the prior expression of agreement, [and] this evidence will be given great weight in determining the meaning attributed to their expressions." *Id.* (quoting Murray on Contracts, 3rd Ed., § 88A, at 424).

¶ 22 Jefferson Imaging contends that the stipulation operated as a total release, despite the parties' characterization to the contrary. Undoubtedly, the "proper construction of a contract is not dependent upon any name given it by the parties, or upon any one provision, but upon the entire body of the contract and its legal effect as a whole." *Kenney v. Jeanes Hospital,* 769 A.2d 492, 496 (Pa.Super.2001). Thus, courts are not to give effect to form over substance when interpreting a contract. *Id.*

¶ 23 Herein, the primary objective of and entire legal accomplishment of the stipulation was to prevent the Tindalls from seeking satisfaction from Dr. Schweitzer's personal assets in exchange for his primary policy limits. Coverage applicable to this lawsuit in the amount of $800,000 from the Pennsylvania MCARE fund remained subject to liability following entry of the stipulation. This latter fact is conceded by Jefferson Imaging itself. Brief of Cross–Appellee, Jefferson Imaging, at 14 n. 2.

¶ 24 In this case, the trial court construed the stipulation as a release for the following reasons:

> When they brought this case, the plaintiffs had two potential sources of recovery from Dr. Schweitzer himself: his insurance coverage and his personal assets. The agreement between the Plaintiffs and Dr. Schweitzer exhausted the insurance coverage, and once the plaintiffs agreed not to pursue Dr. Schweitzer's personal assets, they no longer had a claim against him in any meaningful sense.

Trial Court Opinion, 8/11/05, at 4–5. Since Dr. Schweitzer's insurance coverage clearly was not exhausted by the stipulation and instead, $800,000 in MCARE coverage remained in play, we cannot concur with the trial court's conclusion that the Tindalls no longer had a meaningful claim against Dr. Schweitzer merely by foregoing collection against his personal belongings.

¶ 25 MCARE was created to ensure reasonable compensation for persons injured due to medical negligence. The fund pays claims against participating health care providers for losses or damages awarded in medical professional liability actions in excess of basic insurance coverage. Critical herein is the fact that physicians, among other providers, are **required** to participate in the MCARE program if more than fifty percent of their health care business is conducted within Pennsylvania. Each participating health care provider, including physicians, must pay a certain percentage of the prevailing primary pre-

mium charged by the Pennsylvania Professional Liability Joint Underwriting Association to MCARE. This amount fluctuates each year based upon, among other items, payments made and expenses incurred by MCARE during the previous year. MCARE is the functional equivalent of an insurance provider, to which Dr. Schweitzer personally paid the functional equivalent of a premium each year. MCARE coverage operates similarly to excess insurance.

¶ 26 If Dr. Schweitzer had purchased a policy from an insurance company that provided excess coverage in this action, there would be no question that the release did not operate to fully absolve him from liability in this action. The fact that this case involves MCARE coverage, which Dr. Schweitzer obtained through involuntary payments into the fund, does not warrant a different legal result. The agreement did not "effectively terminate" the claim against Dr. Schweitzer because MCARE coverage was still available to the Tindalls if they established Dr. Schweitzer's culpability at trial.

¶ 27 *Brown v. Cooke,* 707 A.2d 231 (Pa.Super.1998), is instructive. Therein, the plaintiff was injured when his van was struck by a vehicle operated by a driver in the course of his business. The driver held a primary insurance policy and a secondary insurance policy that provided for excess coverage. In exchange for payment of $279,481.97 from the driver's primary insurance policy, the plaintiff agreed to release all claims against the driver individually and his business, but retained the right to pursue a claim against the secondary insurance provider. When the plaintiff sought recovery against the secondary insurance provider, the trial court entered judgment in the insurer's favor, holding that the plaintiff had executed a general release. On appeal, we reversed, holding that the agreement could not be interpreted as a general release due to the clause reserving the plaintiff's claims against the driver's secondary insurance provider. This Court noted that although the clause was inartfully drafted, the parties' clear intent was to permit the plaintiff to pursue his cause of action against the driver to the extent that the driver's actions were covered by the excess insurance policy. We observed that if the parties had intended their agreement to operate as a general release, it would have been illogical to include such a reservation clause.

¶ 28 The case at bar is analogous. Dr. Schweitzer held an insurance policy through his primary carrier, PMSLIC, and obtained coverage through MCARE pursuant to his mandatory payments into that fund. In return for the exhaustion of the primary policy, the Tindalls agreed not to pursue Dr. Schweitzer's personal assets in the event of an excess verdict. That agreement, however, specifically stated that Dr. Schweitzer was not released and included a reservation of the Tindalls' right to pursue MCARE coverage.

¶ 29 Moreover, this scenario does not create a joint tortfeasor relationship in violation of the holding of *Mamalis.* The issue herein is whether the agent was fully released, in which case *Mamalis* would apply. Since Dr. Schweitzer was not completely released, *Mamalis* is not offended.

■ ¶ 30 We also reject Jefferson Imaging's position that the grant of judgment n.o.v. in its favor should be affirmed on the basis that there was insufficient evidence to support the jury's determination that Dr. Schweitzer was its ostensible agent.

"[T]he entry of judgment notwithstanding a jury verdict is a drastic remedy. A court cannot lightly ignore the findings of a duly selected jury." *Neal by Neal v. Lu,* [365 Pa.Super. 464] 530 A.2d 103, 110 (Pa.Super.1987).

There are two bases upon which a court may enter a judgment n.o.v.: (1) the movant is entitled to judgment as a matter of law, or (2), the evidence was such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant. With the first, a court reviews the record and concludes that even with all factual inferences decided adversely to the movant, the law nonetheless requires a verdict in his favor; whereas with the second, the court reviews the evidentiary record and concludes that the evidence was such that a verdict for the movant was beyond peradventure. *Bugosh v. Allen Refractories Co.*, 932 A.2d 901, 907–08 (Pa.Super.2007).

¶ 31 Two elements must be satisfied to establish the liability of a health care provider under the theory of ostensible agent: 1) the patient must look to the principal rather than the agent for medical care; and 2) the principal must hold out the agent as his employee. *See Parker v. Freilich*, 803 A.2d 738 (Pa.Super.2002).

¶ 32 In this case, Mr. Tindall's primary care physician, Dr. Friedman, ordered an MRI in order to confirm a diagnosis of his patient's condition. Regardless of the fact that Mr. Tindall's appointment for that MRI was made by Dr. Friedman's office, Mr. Tindall went to Jefferson Imaging for the diagnostic medical care necessary to confirm his diagnosis. Mr. Tindall indicated that he relied upon Jefferson Imaging for the performance and interpretation of his MRI:

Q. Where was the MRI scheduled to be performed?

A. Jefferson Imaging.

Q. Where is that location?

A. Located in Langhorne, Pennsylvania.

Q. When you went to Jefferson Imaging for the study, did you go there to any particular doctor looking for care?

A. No, sir.

Q. Before you went to Jefferson Imaging, did you know Dr. Mark Schweitzer?

A. No.

Q. Before you went to Jefferson Imaging, did you know any of the individuals who actually performed the testing on your knee for the MRI?

A. I didn't know any of [the] doctors. I was looking towards the facility. Jefferson Imaging was the only name I knew.

Q. Had you heard the name Dr. Mark Schweitzer at any time when you were in the facility having the MRI done?

A. No, I did not.

Q. Did you ever specifically request that Dr. Mark Schweitzer interpret or review your MRI films?

A. No.

Q. What was your understanding of who employed the personnel that performed your test and the individual who was going to interpret your x-ray?

A. My understanding was that they were employed by Jefferson Imaging.

Q. Were there any signs in the Jefferson Imaging facility which would indicate that the individuals who were in that facility performing the testing were the individuals who were going to interpret the x-rays or MRI films were not employed by Jefferson Imaging?

A. No, no indication.

Q. Were you asked to sign any forms when you went to Jefferson Imaging which advised you or asked you to acknowledge that you understood that the individuals who were there in the facility and/or any individuals who might read your films were not employed by Jefferson Imaging?

A. No, I wasn't.

Q. Were you looking to any particular individual or physician at that facility or

anyplace else they might send the films for care?

A. No, I was looking towards Jefferson Imaging.

Q. Did you play any role, and input or say in who the physician would be who interpreted your MRI films.

A. No.

Q. When you went into Jefferson Imaging, did you fill out a patient information history form?

A. Yes.

Q. Did that patient history information form contain information at the top?

A. The logo of Jefferson Imaging [was] at the top.

Q. Did that form list the names of any personnel or doctors anywhere?

A. No.

Q. Did you also, when you went into Jefferson Imaging, sign a form authorizing payment by your health plan for the MRI testing that was being done?

A. Yes, I did.

Q. Who did that form indicate your health plan was to pay?

A. Jefferson Imaging.

Q. Did you ever authorize payment to any doctors or individuals in terms of the performance or interpretation of MRI studies?

A. No.

N.T. Jury Trial, 4/29/04, at 14–17.

¶ 33 Jefferson Imaging held out Dr. Schweitzer, an osteoradiologist, as its employee because 1) it contracted with Dr. Schweitzer to read and interpret the MRI on its behalf; and 2) when he went to Jefferson Imaging's facility, Mr. Tindall was never informed either expressly or implicitly that the radiologist that Jeffer-

son Imaging hired to read its MRIs was an independent contractor rather than an employee.

¶ 34 While Dr. Schweitzer also was an employee of Jefferson University Hospital, he worked for Jefferson Imaging interpreting MRIs for thirteen years. Dr. Schweitzer's interpretative report of Mr. Tindall's MRI was issued on Jefferson Imaging letterhead. Contrary to Jefferson Imaging's assertion, Mr. Tindall did not rely upon Dr. Friedman to interpret the MRI. Dr. Friedman was a family physician, not a radiologist, and Mr. Tindall relied upon Dr. Friedman to recommend treatment. Hence, the evidence, viewed in the light most favorable to the Tindalls, as verdict winners, was sufficient to support the jury's determination that Dr. Schweitzer was Jefferson Imaging's ostensible agent. *See Parker, supra; Capan v. Divine Providence Hospital,* 287 Pa.Super. 364, 430 A.2d 647 (1980). Accordingly, we reverse the entry of judgment n.o.v. in favor of Jefferson Imaging and remand for reinstatement of the jury verdict against it.

■ ¶ 35 We now address the issues raised by Dr. Friedman in his appeal. He first argues that the trial court improperly denied his request that Jefferson Imaging be included on the jury verdict sheet as a joint tortfeasor rather than solely in its capacity as Dr. Schweitzer's principal.[2] Dr. Friedman maintains that evidence was presented that Jefferson Imaging failed to transmit to Dr. Schweitzer the written request prepared by Dr. Friedman regarding the purpose of the April 23, 1997 MRI and specifically, that Dr. Schweitzer diag-

2. We note that before the case was submitted to the jury, Dr. Friedman specifically objected to the trial court's refusal to place Jefferson Imaging on the verdict slip as a joint tortfeasor. N.T. Jury Trial, 5/5/04, at 5–6. Thus, we do not concur with the trial court's finding that this issue is waived for want of a timely objection. Since the objection was made when the court still had the opportunity to correct the verdict slip, it was timely.

nose whether the abnormality was benign or malignant.

¶ 36 The following facts are relevant to a proper resolution of this issue. The Tindalls filed their complaint on January 29, 2001, and alleged that Jefferson Imaging was independently liable both under a corporate negligence theory and as Dr. Schweitzer's principal. Dr. Friedman filed his answer on March 21, 2001; it did not include a crossclaim against Jefferson Imaging. Jefferson Imaging subsequently was awarded summary judgment on the Tindalls' cause of action sounding in corporate negligence.

¶ 37 On April 23, 2004, which was three days before trial commenced, Dr. Friedman filed a crossclaim against both remaining defendants, Jefferson Imaging and Dr. Schweitzer. On April 26, 2004, Dr. Friedman filed a praecipe to withdraw the April 23, 2004 crossclaim. Thus, the issue of Jefferson Imaging's direct liability was not at issue at that point.

¶ 38 At trial, Dr. Schweitzer indicated that Dr. Friedman's written request to eliminate the possibility that the abnormality was cancer "was not transmitted" to him and that had it been, he would have performed new MRI studies and interpreted those studies using a "tumor protocol," thus diagnosing the condition. N.T. Trial, 4/30/04, at 160, 161.

¶ 39 On May 3, 2004, two days before the case was submitted to the jury, Dr. Friedman filed an "Amended CrossClaim" against Dr. Schweitzer and Jefferson Imaging even though at that point, no crossclaim was pending. Dr. Schweitzer and Jefferson Imaging filed preliminary objections to the belated attempt to amend a nonexistent crossclaim, arguing that the amended crossclaim violated the rules of civil procedure because it purported to amend Dr. Friedman's answer to include a crossclaim without permission of the opposing party or the court.

¶ 40 The trial court did not rule on the preliminary objections. On appeal, Dr. Friedman maintains that the trial court did allow the amendment of its answer to include the crossclaim against Jefferson Imaging. However, in this regard, Dr. Friedman only points to a statement that the trial court made during the course of trial that the jury would consider all crossclaims. As noted, crossclaims had been properly filed by Dr. Schweitzer and Jefferson Imaging.

¶ 41 The trial court does state in its opinion that it did allow the amendment to Dr. Friedman's answer to include his crossclaim, but this statement actually is inconsistent with its refusal to place Jefferson Imaging on the jury sheet as a joint tortfeasor. The refusal was based upon the fact that Jefferson Imaging already had been granted summary judgment as to corporate negligence; thus, the trial court implicitly retracted any decision allowing an amendment to raise a crossclaim against Jefferson Imaging based on its independent negligence.

¶ 42 On appeal, Dr. Friedman argues that the evidence established that his written instructions about the purpose for Mr. Tindall's MRI were transmitted to Jefferson Imaging and that the evidence substantiates that it was Jefferson Imaging personnel who failed to transmit his written directions to Dr. Schweitzer to eliminate the possibility of a cancerous condition. Initially, we must note that we are inclined to agree that this evidence was sufficient to establish the independent negligence of Jefferson Imaging and to justify its inclusion as a joint tortfeasor on the verdict slip. Dr. Schweitzer's testimony was quite clear that he did not receive instructions from Jefferson Imaging to diagnose the abnormality and that if he had, he would have conducted and interpreted a second set of MRIs on the knee under a

tumor protocol, thus diagnosing the condition.

¶ 43 However, the fact remains that Dr. Friedman's crossclaim was presented for the first time a mere two days before the case was to be submitted to the jury. When trial commenced, Jefferson Imaging had been granted summary judgment as to its independent negligence, and Dr. Friedman did not have a crossclaim pending against it. Discovery was completed, and Jefferson Imaging had missed its opportunity to discern who was responsible for the failure to transmit Dr. Friedman's written instructions.

¶ 44 When Jefferson Imaging was defending its position that it should not be included on the verdict sheet as a joint tortfeasor, it noted that the written instructions may have been lost in the courier system used by Jefferson Imaging to transmit information to Dr. Schweitzer. That system included the use of Jefferson Hospital personnel, and Jefferson Imaging is not associated with Jefferson Hospital.

¶ 45 Pa.R.C.P. 1033 provides:

A party, either by filed consent of the adverse party or by leave of court, may at any time change the form of action, correct the name of a party or amend his pleading. The amended pleading may aver transactions or occurrences which have happened before or after the filing of the original pleading, even though they give rise to a new cause of action or defense. An amendment may be made to conform the pleading to the evidence offered or admitted.

¶ 46 This rule has been interpreted to allow amendments at any stage of the trial proceedings with the caveat that amendment cannot result in "unfair surprise or prejudice to the other party." *Viener v. Jacobs,* 834 A.2d 546, 560 (Pa.Super.2003). Hence, "If the amendment contains allegations which could have been included in the original pleading, as is the usual case, then the question of prejudice is presented by the **time** at which it is offered rather than by the substance of what is offered." *Id.* (emphasis in original, citations omitted). To state the rule differently, "The possible prejudice ... must stem from the fact that the new allegations are offered **late** rather than in the original pleading. Amendment will not be permitted if it introduces a new theory of liability against a party without sufficient time for the party to defend against that theory." *Id.* (emphasis in original); *accord Schweikert v. St. Luke's Hosp. of Bethlehem, Pennsylvania,* 886 A.2d 265, 270 (Pa.Super.2005).

¶ 47 In the present case, this crossclaim simply was too late. By the time Dr. Friedman actually moved to amend his answer to include it, the presentation of evidence was virtually completed, and Jefferson Imaging was unfairly surprised and unable to defend itself against a theory of liability that was being raised for the first time just prior to submission of the case to the jury. It could not, at that juncture, conduct discovery to ascertain where the default occurred in the transmission process. We therefore believe that the trial court's refusal to submit the issue of Jefferson Imaging's independent negligence to the jury was proper.

¶ 48 Dr. Friedman next suggests that he is entitled to judgment n.o.v. and that the verdict against him is against the weight of the evidence. Specifically, he argues:

Plaintiff did not and could not establish that Dr. Friedman had been negligent, after he appropriately requested a MRI study to "rule out neoplasm" in Mr. Tindall's femur/knee, and received and then relied on a negative report from Dr. Schweitzer, a specialist in radiology, concerning any "abnormality" noted by a previous radiologist. The record es-

tablished that Dr. Friedman acted properly in all respects in relying on this information. Plaintiffs were only able to prevail by imposing an inapplicable heightened standard of care on Dr. Friedman. Dr. Friedman was and is a family care physician. He was not a specialist, but rather a "gatekeeper" who referred his patients to specialists as needed.

Appellant's brief at 18 (citations to record omitted).

¶ 49 We previously set forth the standard for evaluating whether judgment n.o.v. should be entered. In *Bostanic v. Barker–Barto*, 936 A.2d 1084, 1087 (Pa.Super.2007) (quoting *Thompson v. City of Philadelphia*, 507 Pa. 592, 493 A.2d 669, 672–73 (1985)), we outlined our Supreme Court's summary of the principles applicable when an appellate court reviews a claim that a verdict is against the weight of the evidence:

This Court has repeatedly emphasized that it is not only a trial court's inherent fundamental and salutary power, but its duty to grant a new trial when it believes the verdict was against the weight of the evidence and resulted in a miscarriage of justice. Although a new trial should not be granted because of a mere conflict in testimony or because the trial judge on the same facts would have arrived at a different conclusion, a new trial should be awarded when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail.

Our court has consistently held that appellate review of the trial court's grant of a new trial is to focus on whether the trial judge has palpably abused his discretion, as opposed to whether the appellate court can find support in the record for the jury's verdict.

To determine whether a trial court's decision constituted a palpable abuse of discretion, an appellate court must examine the record and assess the weight of the evidence; not, however, as the trial judge, to determine whether the preponderance of the evidence opposes the verdict, but rather to determine whether the court below in so finding plainly exceeded the limits of judicial discretion and invaded the exclusive domain of the jury. Where the record adequately supports the trial court, the trial court has acted within the limits of its judicial discretion.

¶ 50 Herein, we cannot concur with Dr. Friedman's position that he was entitled to rely upon Dr. Schweitzer's report. That report indicated that there was a **possibility** that the abnormality was a benign condition. In other words, it was possible that it was benign and also possible that it was not benign. Dr. Friedman was specifically instructed by the radiologist who interpreted Mr. Tindall's 1997 x-ray to determine whether the abnormality, which was noted to be unrelated to the fall, was cancer. The radiologist was sufficiently concerned about the risk of cancer that he telephoned Dr. Friedman's office to ensure that a proper diagnosis was rendered. Dr. Friedman did not ensure that the April 23, 1997 MRI eliminated the possibility that the abnormality on Mr. Tindall's left knee was malignant.

¶ 51 Moreover, in March 1998, nearly a year after his fall, Mr. Tindall complained about pain, locking, and momentary dislocation in his left knee. Dr. Friedman did not order additional radiological studies, as recommended by Dr. Schweitzer. The evidence presented by the Tindalls supported a finding that in March 1998, the cancer had not yet dedifferentiated. It was not until June 1999, when Mr. Tindall finally insisted on seeing a specialist and present-

ed with fatigue and weight loss, that an appropriate referral was made and the condition was diagnosed.

¶ 52 These facts, coupled with the expert testimony presented by the Tindalls, establish that Dr. Friedman is not entitled to judgment as a matter of law. We do not believe that the evidence was such that no two reasonable minds could disagree that the outcome at trial should have been in Dr. Friedman's favor. Furthermore, we cannot conclude that the verdict was a miscarriage of justice or so contrary to the evidence as to shock our sense of justice. Thus, the trial court did not palpably abuse its discretion in refusing to find that the verdict was against the weight of the evidence.

 ¶ 53 Dr. Friedman's next complaint relates to the trial court's decision to restrict his *voir dire* of prospective jurors in two respects. Our standard of review of the trial court's conduct of *voir dire* is as follows:

> The sole purpose of voir dire examination is to secure a fair, competent and impartial jury. To achieve this purpose, general questions should be permitted so that it can be determined whether any of the veniremen have a direct or even a contingent interest in the outcome of the litigation or the parties involved. The scope and extent of voir dire examination is within the sound discretion of the trial court and the trial court's rulings thereon will not be disturbed absent a clear abuse of that discretion.

*Capoferri v. Children's Hosp. of Philadelphia,* 893 A.2d 133, 138 (Pa.Super.2006) (quoting *Ball v. Rolling Hill Hospital,* 359 Pa.Super. 286, 518 A.2d 1238, 1244–45 (1986)).

 ¶ 54 Dr. Friedman's first contention relates to the following question that he sought to ask, "Have any members of the jury panel had such an unsatisfactory experience or relationship with a physician or other health care provider so as to render him or her incapable of serving as a fair and impartial juror in this case?" Appellant's brief at 23.

¶ 55 As noted above, questioning of veniremen should involve general inquiries into their ability to be fair and impartial. Dr. Friedman's proposed question was a specific question about a potential source of prejudice stemming from a bad experience with doctors or medical providers. However, the record establishes that potential jurors were asked numerous questions, n.t. trial, 4/26/04, at 6–10, including other questions encompassing jurors' experiences with medical providers. *See* Reproduced Record at 1697a–1717a.[3]

¶ 56 The veniremen were asked whether they or any member of their family "considered" bringing a "civil action including a medical malpractice claim against a physician, hospital, or other health care provider" and whether they or any family member had "made a claim or lawsuit against a hospital, radiology facility or doctor." *Id.* at 1698a, 1702a; *see also id.* at 1708a ("Have you or any member of your immediate family ever asserted a medical malpractice claim against a doctor, hospital or

---

3. The record contains the following stipulation:

> The Certified Record in this matter having been previously remanded to the Trial Court, and the Trial Court being currently unable to locate the Certified Record, the parties, by their undersigned respective counsel, hereby agree and stipulate, as reflected by the signing of this Stipulation in counterparts, to the use of the Joint Reproduced Record previously filed with the Superior Court, in lieu of the Certified Record, to the extent the Panel finds it necessary and sufficient to resolve the remaining issues on appeal.

other medical professional? If so, please describe the nature of the claim."). In addition, after a brief summary of the evidence that the Tindalls were going to present was outlined for potential jurors, they were asked, "Knowing no more about this case than I have told you, do any of you feel that you would not be able to hear and decide this case based solely on the evidence and the law I give to you and render a verdict in favor of the Defendants if required by the evidence and the law?" *Id.* at 1704a. Clearly, these four questions were sufficient to explore any potential bias that the veniremen had against doctors and medical providers, which was the subject of Dr. Friedman's rejected question. Indeed, by asking if any potential juror had "considered" making a claim against a physician or health care provider, the trial court implicitly covered the subject of whether a juror had any "unsatisfactory experience or relationship" with a doctor or medical provider.

¶ 57 Dr. Friedman also complains that he should have been able to further question three jurors who gave potentially disqualifying answers on their questionnaires. This complaint concerns the following ruling by the trial court:

[THE COURT]: I failed to mention this morning, I want to make reference to the jury questionnaires that you have before you. I want you to look at question Number 1, Number 16 and 19 to 24. Counsel may not follow up on those questions because, in my opinion, those questions give prospective jurors excuses to avoid jury service.

One of the questions is: "Will you have sympathy for the plaintiff in a civil case?" These questionnaires are filled out when they arrive. They haven't had the orientation program, they haven't seen the film. They don't now what a plaintiff is. Many of them don't know what a civil case is. They will answer that question, "Yes."

Another favorite question of mine is: "Will you have difficulty following the Court's instructions?" The answer will be "Yes."

I have found in doing this for over 28 years, if the jury has any problems with law, they can always ask questions.

N.T. Trial, 4/26/04, 22–23.

¶ 58 After the trial court disseminated this information to counsel, Dr. Friedman did not object and did not inquire of the court whether he could specifically question the three jurors about their answers on the questionnaire form. Thus, this issue has been waived for purposes of this appeal. As we recently stated in *Thompson v. Thompson*, 2008 PA Super 285, ¶ 4, 963 A.2d 474 (quoting *Hong v. Pelagatti*, 765 A.2d 1117, 1123 (Pa.Super.2000)):

[I]n order to preserve an issue for appellate review, a party must make a timely and specific objection at the appropriate stage of the proceedings before the trial court. Failure to timely object to a basic and fundamental error will result in waiver of that issue. On appeal the Superior Court will not consider a claim which was not called to the trial court's attention at a time when any error committed could have been corrected. In this jurisdiction one must object to errors, improprieties or irregularities at the earliest possible stage of the adjudicatory process to afford the jurist hearing the case the first occasion to remedy the wrong and possibly avoid an unnecessary appeal to complain of the matter.

¶ 59 In this case, Dr. Friedman neither objected nor requested that the court permit him further inquiry. Thus, the trial court was not given an opportunity to correct any purported error in its restriction of further questioning of the three jurors in question, and this issue is waived.

¶ 60 In addition, as noted, the answers were given on the initial jury questionnaires. Extensive *voir dire* was then conducted before the jurors were actually seated. Specific questioning conducted during *voir dire* dispelled the appearance of prejudice that was suggested by the answers given by the three jurors on the forms. After the pertinent facts at issue in this case were reviewed, the jurors were asked whether they would be able to render a defense verdict if one were warranted by the evidence and the law as disseminated by the trial court. In addition, they were asked, "Do you know of any reason why you could not be a completely fair and impartial juror and render a verdict based solely upon the evidence you hear in this courtroom and the law as the Judge instructs? If yes, please explain." *Id.* at 1710a. Thus, the actual *voir dire* questioning conducted after the jurors completed the forms essentially negated the trial court's initial restriction on further questioning.

¶ 61 Dr. Friedman's next allegation of error concerns the jury instructions. He complains about the fact that the trial court refused to give an "error in judgment" charge, to instruct the jury that a doctor is not a guarantor of success, and to inform the factfinders that an unsuccessful outcome of a plaintiff's treatment does not, by itself, establish a lack of due care by the physician was error.

When examining jury instructions, we must determine whether the trial court committed a clear abuse of discretion or error of law controlling the outcome of the case. *Stewart v. Motts,* 539 Pa. 596, 654 A.2d 535 (1995). It is only when "the charge as a whole is inadequate or not clear or has a tendency to mislead or confuse rather than clarify a material issue" that error in a charge will be found to be a sufficient basis for the

award of a new trial. *Id.* at 540. We explained that

> a charge will be found adequate unless "the issues are not made clear to the jury or the jury was palpably misled by what the trial judge said or unless there is an omission in the charge which amounts to fundamental error." *Voitasefski v. Pittsburgh Rys. Co.,* 363 Pa. 220, 226, 69 A.2d 370, 373 (1949). A reviewing court will not grant a new trial on the ground of inadequacy of the charge unless there is a prejudicial omission of something basic or fundamental. *Sweeny v. Bonafiglia,* 403 Pa. 217, 221, 169 A.2d 292, 293 (1961); *Giorgianni v. DiSanzo,* 392 Pa. 350, 356, 140 A.2d 802, 805 (1958). In reviewing a trial court's charge to the jury, we must not take the challenged words or passage out of context of the whole of the charge, but must look to the charge in its entirety. *McCay v. Philadelphia Electric Company,* 447 Pa. 490, 499, 291 A.2d 759, 763 (1972).

*Id.*

*Ferrer v. Trustees of University of Pennsylvania,* 573 Pa. 310, 825 A.2d 591, 612 (2002).

¶ 62 Herein, Dr. Friedman relies upon *Havasy v. Resnick,* 415 Pa.Super. 480, 609 A.2d 1326 (1992), where we approved the trial court's decision to give the instructions that Dr. Friedman requested herein. In the sixteen years since *Havasy* was decided, however, we have expressed reservations about the continued vitality of this type of instructions, which has been eliminated entirely from the Proposed Standard Civil Jury Instructions:

> Since at least 1981, there has been no reference to the error in judgment exception in the standard civil jury instruction on a physician's standard of care. *See* Pa. S.S.J.I. (Civ.) 10.03A (2003); Pa.

S.S.J.I. (Civ.) 10.03A (1981). The note to 10.03A specifically states that "error in judgment" and its exceptions are not included in the charge because "the principles contained therein are adequately covered by the charge on the professional standard of care." Pa. S.S.J.I. (Civ.) 10.03A, Subcommittee Note (2003); *see also* Pa. S.S.J.I. (Civ.) 10.03A, Subcommittee Note (1981) (same). The 2003 note further states that giving a separate charge on a physician's "judgment" is more likely to mislead and confuse the jury than add to its understanding. Pa. S.S.J.I. (Civ.) 10.03A, Subcommittee Note (2003). The proper focus is whether the physician's **conduct** (be it an action, a judgment, or a decision) was within the standard of care. *Id.*

*D'Orazio v. Parlee & Tatem Radiologic Associates, Ltd.*, 850 A.2d 726, 728–729 (Pa.Super.2004) (emphasis in original); *accord Gunn v. Grossman*, 748 A.2d 1235 (Pa.Super.2000) (trial court properly denied giving error-in-judgment charge when concept was covered adequately by other instructions).

¶ 63 Herein, the trial court gave an extensive and accurate charge on the concepts of medical malpractice, a medical provider's duty of care, and the causation requirements in a medical malpractice case. *See* N.T. Trial, 5/5/04, at 22–26. Those instructions adequately informed the jury on the pertinent concepts in this case and were sufficient to cover the concepts that a doctor is not liable for a mere error in judgment, he is not a guarantor of treatment, and that a poor outcome does not establish malpractice. The jury had to find that Dr. Friedman deviated from the applicable standard of care in order to find him liable.

¶ 64 We conclude that *Vallone v. Creech*, 820 A.2d 760 (Pa.Super.2003), is analogous. In that case, a woman recovered from a bout of breast cancer. She returned to her doctor with a lump in her breast, and the doctor did nothing to determine the status of the lump, even though he admitted that there was a twenty percent chance that the lump was malignant. Since the doctor failed to perform any testing under circumstances where such testing should have been conducted, we held that an error-in-judgment charge was not warranted by the evidence.

¶ 65 In this case, Dr. Friedman was informed by a radiologist that Mr. Tindall's x-ray revealed an abnormality that might be cancerous, and that radiologist recommended both in writing and orally that an MRI be conducted specifically to rule out the potential that the abnormality was malignant. The MRI report that Dr. Friedman received did not eliminate the possibility that the abnormality was cancerous. It also recommended follow-up testing. Dr. Friedman did not order further radiological studies despite the fact that nearly a year after Mr. Tindall fell onto grass, he continued to present with pain and movement difficulties in his left knee. Under the circumstances, we conclude that the trial court did not abuse its discretion in refusing the specific language proposed by Dr. Friedman and that the instructions on medical malpractice adequately covered the concepts in question.

¶ 66 Dr. Friedman next complains about the size of the personal injury award rendered in this action and requests that we grant remitittur. Dr. Schweitzer also raises this contention in his appeal.

Our standard of review in reversing an order denying a remitittur by a trial court is confined to determining whether there was an abuse of discretion or an error of law committed in such denial. *Smalls v. Pittsburgh–Corning Corp.*, 843 A.2d 410, 414 (Pa.Super.2004).

. . . .

The grant or refusal of a new trial because of the excessiveness of the verdict is within the discretion of the trial court. *Hall v. George,* 403 Pa. 563 170 A.2d 367 (1961). This court will not find a verdict excessive unless it is so grossly excessive as to shock our sense of justice. *Kravinsky v. Glover,* 263 Pa. Superior Ct. 8, 396 A.2d 1349 (1979). We begin with the premise that large verdicts are not necessarily excessive verdicts. Each case is unique and dependent on its own special circumstances and a court should apply only those factors which it finds to be relevant in determining whether or not the verdict is excessive. *Mineo v. Tancini,* 349 Pa. Superior Ct. 115, 502 A.2d 1300 (1986). *Gbur v. Golio,* 932 A.2d 203, 212 (Pa.Super.2007). In addition, " 'damages for loss of consortium have no market value, and the amount awarded for loss of consortium is left to the sound judgment and common sense' of the fact-finder." *Urmann v. Rockwood Casualty Insurance Co.,* 905 A.2d 513, 518 (Pa.Super.2006) (quoting *Mendralla v. Weaver Corp.,* 703 A.2d 480, 488, n. 4 (Pa.Super.1997)).

¶ 67 In the present case, we cannot conclude that the trial court abused its discretion in refusing to grant remittitur. Mr. Tindall has a **significantly** increased risk of recurrence and metastasis of his cancer and of dying from that disease. Furthermore, because the cancer was not diagnosed in 1997, when it was low-grade, Mr. Tindall suffered debilitating chemotherapy treatments and was rendered sterile. He suffered from depression and withdrew from his wife. He testified that there is not a day when he does not think about his cancer and his fear that he will not live to see his child grow-up. He cannot obtain life insurance to insure the financial security of his family. Mrs. Tindall had to undergo *in vitro* fertilization to become pregnant and will have to endure that medical procedure again in the future. She was deprived of the companionship and help of her husband while he underwent the vigorous treatments, and faces the potential loss of her husband from an untimely death. She understandably has been and will be affected by the fear of cancer that pervades her marital life. Given the impact of this disease on the lives of the Tindalls, we simply cannot say that the verdict was so grossly excessive that our sense of justice is shocked.

¶ 68 In his appeal, Dr. Schweitzer raises an additional issue that was not presented by Dr. Friedman. He maintains that the delay damage award entered in this case improperly included the period from September 26, 2003, to commencement of trial. He notes that the case was set for trial on September 26, 2003, and the defendants were prepared. Ten days before a jury was to be selected, the Tindalls moved for a continuance because their counsel's wife was thirty-seven weeks pregnant and was due to give birth during the course of trial.

¶ 69 "We review a ruling under Rule 238 for an abuse of discretion, and we will not reverse a trial court's decision regarding the imposition of delay damages absent such an abuse." *Krebs v. United Refining Co. of Pennsylvania,* 893 A.2d 776, 794 (Pa.Super.2006). However, if we are interpreting Pa.R.C.P. 238, that issue involves a question of law, in which case "we are not constrained by the determination of the trial court; our standard of review is *de novo.*" *Jones v. Rivera,* 866 A.2d 1148, 1150 (Pa.Super.2005).

¶ 70 Pa.R.C.P. 238 governs imposition of delay damages and states specifically that the "period" for "which damages for delay shall be calculated" shall "exclude the period of time ... during which the plaintiff caused delay of the trial." Pa.R.C.P. 238(b)(1). Rule 127, which governs our construction and interpretation of rules of

court, instructs us that "When the words of a rule are free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." Pa. R.C.P. 127(b).

¶ 71 In this case, we conclude that the trial court misinterpreted Rule 238 by imposing delay damages for the period when trial was postponed due to a continuance requested by the plaintiffs' lawyer. The Tindalls were the plaintiffs herein, and their counsel moved for the continuance when the three defendants were ready to proceed. This delay was not the result of any action by the defendants or the court system. Under the clear wording of Rule 238, the Tindalls cannot be awarded delay damages for that period.

¶ 72 The Tindalls attempt to disassociate themselves from their own counsel, arguing that he, rather than they, was responsible for the delay. There is no such distinction in this context. The plaintiffs moved for a continuance for personal reasons, the validity of which we do not contest, of their counsel. The ensuing postponement of trial was solely caused at the request of their representative in this action.

¶ 73 Under Rule 238, the reason for the delay is not pertinent; the sole issue under Rule 238 is whether the "plaintiff" caused the delay. If proceedings are postponed by any other mechanism, delay damages are imposed. However, in this case, the Tindalls, as plaintiffs, moved for the continuance. They are not entitled to an award of delay damages for the hindrance occasioned by their actions. *Wirth v. Miller*, 398 Pa.Super. 244, 580 A.2d 1154, 1159 (1990) (where plaintiffs moved for continuance, they could not receive delay damages for period occurring between original trial date and when rescheduled trial commenced); *see generally Tindal v. Southeastern Pennsylvania Transportation Authority*, 385 Pa.Super. 94, 560 A.2d 183 (1989) (defendants were entitled to evidentiary hearing to establish whether plaintiff was responsible for delay in trial proceedings because such hindrance would be excludable in delay-damage calculation). The Tindalls cannot receive delay damages for the period between September 26, 2003, and the commencement of trial, April 26, 2004. Hence, we must remand for recalculation of delay damages.

¶ 74 Judgment notwithstanding the verdict entered in favor of Jefferson Imaging is reversed and the case is remanded for entry of judgment on the verdict against Jefferson Imaging. The case also is remanded for recalculation of delay damages in accordance with our directive herein. In all other respects, the jury award entered in favor of Jeffrey and Silvia Tindall is affirmed. Jurisdiction relinquished.

¶ 75 Judge SHOGAN files a Concurring and Dissenting Opinion.

Concurring and Dissenting OPINION BY SHOGAN, J.:

¶ 1 I concur in the result reached by the Majority with the exception of the reversal of the judgment notwithstanding the verdict ("JNOV"). For the reasons set forth below, I respectfully dissent from the Majority's conclusion as it pertains to the JNOV and the release entered into by the Tindalls and Dr. Schweitzer.

¶ 2 As noted in the Majority Opinion, Jefferson Imaging moved for a JNOV and argued that an agreement between the Tindalls and Dr. Schweitzer, the ostensible agent of Jefferson Imaging, relieved Jefferson Imaging of any liability. The agreement in question was that Dr. Schweitzer would pay to the Tindalls $400,000, the limits of his primary professional policy of insurance. This agreement was entered into, regardless of the verdict, in exchange for the Tindalls' agreement not to execute on Dr. Schweitzer's person-

al assets if the verdict was in excess of Dr. Schweitzer's professional insurance limits and any amount paid from the Medical Care Availability and Reduction of Error Act ("MCARE"), 40 P.S. § 1303.101–1105, fund.[1] Ultimately, the trial court concluded that Jefferson Imaging was entitled to JNOV.

¶ 3 Initially, I note that

a JNOV can be entered upon two bases: (1) where the movant is entitled to judgment as a matter of law; and/or, (2) the evidence was such that no two reasonable minds could disagree that the verdict should have been rendered for the movant. When reviewing a trial court's denial of a motion for JNOV, we must consider all of the evidence admitted to decide if there was sufficient competent evidence to sustain the verdict ... Concerning any questions of law, our scope of review is plenary. Concerning questions of credibility and weight accorded the evidence at trial, we will not substitute our judgment for that of the finder of fact ... A JNOV should be entered only in a clear case.

*Parker v. Freilich*, 803 A.2d 738, 744 (Pa.Super.2002) (citation omitted), *appeal denied*, 573 Pa. 659, 820 A.2d 162 (2003).

¶ 4 In its post-trial motion, Jefferson Imaging argued that it was entitled to JNOV because all claims against it had been released under the terms of an agreement that was made between the Tindalls and Dr. Schweitzer. The trial court concluded that the agreement released Jefferson Imaging from liability. The trial court relied on *Mamalis v. Atlas Van Lines, Inc.*, 522 Pa. 214, 560 A.2d 1380 (1989), wherein the Pennsylvania Supreme Court held that the termination of a claim against the agent extinguishes the derivative claim against the principal. I conclude there was no error in the trial court's decision to grant the motion for JNOV in favor of Jefferson Imaging as the ostensible principal.

¶ 5 The record reflects that the Tindalls agreed to accept from Dr. Schweitzer $400,000, the limits of his primary professional policy, in exchange for the Tindalls' promise not to execute against Dr. Schweitzer's personal assets in the event of a verdict in excess of Dr. Schweitzer's professional liability insurance. *See* Letter Memorializing Agreement, 6/8/04. The operative effect of the agreement was to release Dr. Schweitzer from further liability. Pursuant to *Mamalis,* the agreement also extinguished the derivative claim against Jefferson Imaging, as a matter of law, because Dr. Schweitzer was the agent of Jefferson Imaging. While the language of a letter executed after trial reflects that the Tindalls and Dr. Schweitzer (with no participation by Jefferson Imaging) stipulated the agreement was not a release (*see* Letter Memorializing Agreement, 6/8/04, at 1–2), such stipulation does not alter the legal result of the agreement. The agreement effectively terminated the claim against Dr. Schweitzer and, therefore, extinguished the Tindalls' only remaining claim against the principal, Jefferson Imaging. *See Mamalis*, 522 Pa. at 221, 560 A.2d at 1383 (holding that an agent and its principal are not joint tortfeasors under Pennsylvania law where liability of the principal is vicarious, and that termination of the claim against the agent extinguishes the derivative claim against the principal; a claim of vicarious liability is **indivisible and inseparable** from the claim against the agent since any cause of action is based on the acts of only one tortfeasor).

¶ 6 The Majority posits that the agreement should not be construed as a release because MCARE was still involved and remained an insurance policy and personal asset of Dr. Schweitzer. I cannot agree.

---

1. Jefferson Imaging was not a party to the agreement.

¶ 7 Pursuant to MCARE, health care providers have the ability to enter into release agreements with claimants. In this respect, MCARE provides as follows:

### § 1303.714. Medical professional liability claims

\* \* \*

(e) Releases.—In the event that a basic coverage insurer or self-insured participating health care provider enters into a settlement with a claimant to the full extent of its liability as provided in this chapter, it may obtain a release from the claimant to the extent of its payment, which payment shall have no effect upon any claim against the fund or its duty to continue the defense of the claim.

40 P.S. § 1303.714(e). Thus, Section 1303.714(e) provides for an unqualified release in this situation, despite the fact that a claim remains against the fund and the basic coverage insurer has a duty to continue to defend that claim.

¶ 8 I agree with the Tindalls that the agreement between them and Dr. Schweitzer had no effect on any coverage under MCARE. However, that issue is of no moment as the disposition in this case is controlled by *Mamalis* and compelled by the legislature's enactment of Section 1303.714. Jefferson Imaging was released as a matter of law pursuant to *Mamalis* and Section 1303.714 because the claim against Jefferson Imaging was indivisible and inseparable from the claim against Dr. Schweitzer.

¶ 9 I reiterate, as a matter of law, plaintiffs and agents/health care providers cannot unilaterally contract around the protections provided principals under *Mamalis* and Section 1303.714. As stated by the trial court, the *Mamalis* holding "cannot be altered by the terms of an agreement in which the ostensible principal did not join, no matter how artfully drafted." Supplemental Trial Court Opinion, 8/11/05, at 5 (emphasis in original).

¶ 10 The Majority, while presenting a thoughtful rationale, comes to a conclusion on this issue with which I respectfully cannot agree. In the Majority, it is asserted that MCARE is an asset of Dr. Schweitzer's that remained subject to liability. However, MCARE is not a personal asset; it is a statutorily mandated public fund. It is inaccurate to refer to the fund as an asset of the physician. This mischaracterization is further evidenced by the agreement between Dr. Schweitzer and the Tindalls themselves. The agreement released Dr. Schweitzer's personal assets. Therefore, under the Majority's rationale, if the fund were an asset, it was released with Dr. Schweitzer's other assets. However, MCARE remains liable in this matter, and the fund cannot be considered an asset because Dr. Schweitzer's assets were released.[2]

---

2. The Majority appears to also mischaracterize the facts of the case on this narrow issue. The Majority states that the Tindalls did not "give up" or "abandon" their claims against Dr. Schweitzer and hence did not release him. Majority Op., at 1166. Aside from the fact that it is undisputed that the MCARE fund remained a viable source of recovery and that Section 1303.714(e) requires a basic coverage insurer to **continue to defend** when a claim against MCARE remains, a review of the record reflects that the Tindalls did effectively release Dr. Schweitzer. By agreeing to settle against Dr. Schweitzer for the full amount of his insurance policy, in conjunction with their promise not to execute against his personal assets, they released Dr. Schweitzer from liability. Any language indicating otherwise in the letter memorializing and defining the terms of their agreement, which was executed after the verdict, is of no moment **as a matter of law** pursuant to *Mamalis* and Section 1303.714(e). As stated in the Majority, the "proper construction of a contract is not dependent upon any name given it by the parties, or upon any one provision, but upon the entire body of the contract and its

¶ 11 Additionally, the Majority states that *Brown v. Cooke,* 707 A.2d 231 (Pa.Super.1998) is instructive and that it illustrates how the terms of a release prevented a claim from being extinguished against a secondary policy of insurance. However, it is undisputed that the Tindalls reserved the right to recover against the MCARE fund in this case. Furthermore, *Brown* is factually distinguishable and does not address, no less answer, the specific question presented by this case.

¶ 12 *Brown* **was not an agency case** and did not involve or discuss the principle of law enunciated in *Mamalis.* *Brown* concerned a claim against a secondary policy of privately purchased insurance. All other claims were released by the agreement in that case. In addition, the facts in *Brown* were markedly different as the excess insurer, Allstate Insurance Company, was clearly not a principal of either the primary automobile insurance carrier, Travelers Insurance Company, or the driver/defendant. Moreover, *Brown* did not involve or discuss MCARE, or the rationale underpinning the holding in *Mamalis.*

¶ 13 As noted above, the Supreme Court made clear that parties cannot contract around *Mamalis* by holding, **as a matter of law,** that the release of an agent extinguishes any claim against a vicariously liable principal. *Mamalis,* 522 Pa. at 221, 560 A.2d at 1383. Furthermore, the legislature has spoken in this area and reinforced the *Mamalis* principle in the MCARE context by the enactment of 40 P.S. 1303.714(e).

¶ 14 Finally, there is a clear public policy consideration behind the rationale posited in *Mamalis* and reinforced within the MCARE context by Section 1303.714(e). An obvious concern is that if the agree-

ment in question in the instant case does not extinguish the claim against Jefferson Imaging, and Jefferson Imaging is liable for the excess verdict solely as Dr. Schweitzer's principal, Jefferson Imaging may seek to recover against Dr. Schweitzer. Such a scenario would nullify the agreement and arguably conflict with 40 P.S. § 1303.714(e) (releases under MCARE). That is precisely the situation our Supreme Court sought to avoid when it held in *Mamalis* that vicariously liable principals and agents are not joint tortfeasors under the Uniform Contribution Among Joint Tortfeasors Act (UCATA). From a public policy perspective, a circuitry of litigation, including indemnification claims between principals and agents, would be created which would only act to discourage settlements in this area. I discern no error in the trial court's conclusion on this issue, and I, therefore, respectfully dissent.

---

legal effect as a whole[.]" Majority Op., at 1166 (quoting *Kenney v. Jeanes Hospital,* 769 A.2d 492, 496 (Pa.Super.2001)). Thus, even if construed as a limitation on the Tindalls' pool

of recovery, the agreement similarly limited recovery against Jefferson Imaging because the claim was **indivisible and inseparable.**