J-A25022-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| D.W., | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| B.K.V., JR., | |
| Appellee | No. 620 MDA 2016 |

Appeal from the Order Entered March 29, 2016
In the Court of Common Pleas of Lebanon County
Domestic Relations at No(s): 2008-5-0774

BEFORE:  FORD ELLIOTT, P.J.E., SHOGAN, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY SHOGAN, J.:                    **FILED DECEMBER 06, 2016**

This is an appeal by D.W. ("Mother") from a support order relating to B.V. ("Child"), her seventeen-year-old son with B.K.V., Jr. ("Father").[1]  We are compelled to reverse and remand.

The trial court described the parties as "frequent flyers in Lebanon County Support Court."  Trial Court Opinion, 3/29/16, at 1.  The trial court summarized the facts and procedural history as follows:

> MOTHER and FATHER are the parents of [B.V.], who was born [i]n March [of] 1999.  The parties were married on May 1, 1998 and separated on September 12, 2008.  The parties had originally reached a private agreement on the amount of child

---

[*]  Former Justice specially assigned to the Superior Court.

[1]  The parties "also have an emancipated [son] who is not subject to" the order appealed.  Trial Court Opinion, 3/29/16, at 2 n.1.

support, but MOTHER requested modification on August 5, 2014.[2]  After a hearing on December 11, 2014, the Domestic Relations Master (DRM) recommended that FATHER pay $1,624.65 per month from the date of filing through the end of 2014 and $1,458.49 per month for 2015.  MOTHER filed exceptions and, after hearing oral arguments, we remanded the case to the DRM via an Opinion dated March 30, 2015.  Among other things, we directed the DRM to clarify how she evaluated FATHER's income from 933 Restricted Stock Units (RSUs) that were awarded to him in 2010 and vested in 2014.

Subsequent to a remand hearing conducted on April 23, 2015, the DRM explained that she evaluated the stocks based on the difference between their value on the date of the property settlement, $35.63, and the exercise price, $61.48.  She then multiplied this difference by 933 to arrive at $24,118.05, which figure she added to FATHER's 2014 income.  In the end, FATHER's obligation, effective August 5, 2014 through the end of the year, was $1,639.65 per month, about $15 per month more than the previously-calculated figure.  For 2015, FATHER's obligation was $1,505.92 per month, less than a $50 per month increase from the previously calculated figure.  MOTHER again filed exceptions, arguing, *inter alia*, that the DRM valued 836 of FATHER's stock options (award no. 19655) incorrectly, and that she failed to include the income from 359 RSUs (award no. 41075) that vested on August 1, 2015.

While we denied most of MOTHER's Exceptions via an Opinion issued on August 6, [2015,] we agreed that the DRM's methodology for valuing the 836 stock options was incorrect.  Instead, to account for the *quid pro quo* value of the stock options at equitable distribution, we measured the difference in the present value, $78.10 (as of the date of the remand hearing, April 23, 2015), and the value on the date of the property settlement, $35.63.  Multiplying this figure times the number of shares yielded $29,786.68.  Subtracting this figure from

---

[2]  Mother "works for the Pennsylvania House of Representatives in Caucus Operations," and Father "sells medical devices, which require[s] him to travel extensively.  In addition to his salary and commissions, he receives stock options and corporate perquisites as part of his compensation package." Trial Court Remand Opinion, 3/30/15, at 2.

$65,291.60 ($78.10 x 836 shares) yielded $35,504.92, which number we added to FATHER's 2015 gross income. This resulted in a monthly obligation for 2015 of $1,639.92.

We specifically declined to address the RSUs that vested on August 1, 2015, noting that they were not yet vested at the time of the hearing, but that we would not prevent MOTHER from addressing them once they did vest. Predictably, on September 1st, MOTHER filed [a] Petition for Modification. A hearing was conducted on October 29, 2015 and the DRM issued her Recommendations on November 20[th][, 2015]. Again, MOTHER timely filed exceptions, disputing the DRM's methodology in evaluating the RSUs.

We heard oral arguments on February 23, 2016. At oral argument, both counsel agreed that it made little sense to continue fighting over relatively small amounts of money. Counsel therefore asked if we would agree to receive and base a prospective decision upon a stipulation of facts. We afforded the parties 10 days to submit a stipulation regarding their income. We also agreed that if the parties could reach a consensus on the facts, we would fashion a Court Order dictating FATHER's prospective obligation based on this stipulation rather than remanding the case to the DRM yet again. On March 7, we received a Stipulation of Facts showing that:

(1) FATHER's wages, tips and compensation, as reflected by his W-2, were $248,754.40, his Medicare wages and tips were $266,754.40 and his gross pay was $271,131.37.

(2) MOTHER's wages, tips and compensation for 2015, as reflected by her W-2, were $55,980.63, and her Medicare wages and tips were $59,732.84. Although the stipulation itself did not list MOTHER's gross pay, her unofficial W-2, which was attached, lists her gross pay at $60,036.13.

(3) FATHER had $30,728.88 in gross income from stock options in 2015. The net, post-tax value of the RSUs FATHER exercised on August 1, 2015 was $19,519.11. His net receipts from RSUs in 2015 [were] $21,243.69.

(4) He has 194 RSUs that were granted after the divorce that will mature on July 30, 2016.[3]

> [3] He also has stock options that will mature in 2017, but this will be after the parties' son has become emancipated.

(5) FATHER contributed $18,000 to his 401(k) in 2015.

(6) FATHER paid $4,981.41 in 2015 for medical, dental, vision and life insurance benefits for himself and his family.

(7) MOTHER paid $600.29 in 2015 for medical, dental and vision benefits that will benefit herself and her children.

(8) MOTHER made $3,752.21 in mandatory contributions to the State Employees Retirement System.

(9) FATHER pays $1,700 per month in alimony to MOTHER. This payment will terminate on March 31, 2016.

(10) FATHER's fixed vehicle allowance of $398.44 is part of his income.

(11) Neither party has experienced an increase in income to date in 2016.

Trial Court Opinion, 3/29/16, at 2–6 (some footnotes omitted).

The trial court entered an order on March 29, 2016, directing Father to pay $1,571.96 per month in child support plus $157.20 per month in arrears, effective August 1, 2015. Effective April 1, 2016, the amount of child support increased to $1,710.45 per month, and the amount in arrears increased to $171.04 per month. The court directed Father to provide

medical coverage through his employment. Mother filed a timely appeal on April 19, 2016. Both Mother and the trial court complied with Pa.R.A.P. 1925.[3]

Mother raises the following issues in her appellate brief:

A. Did the Trial Court err as a matter of law and/or abuse its discretion in its March 29, 2016 Order when it failed to calculate as part of [Father's] income Vested Stock Options from 2014 that it previously included as income in its August 4, 2015 Order for calendar year 2015?

B. Did the Trial Court err as a matter of law and/or abuse its discretion in its March 29, 2016 Order when it failed to provide an adjustment for the health insurance premium [Mother] contributes to cover the parties' minor child?

C. Did the Trial Court err[] as a matter of law and/or abuse[] its discretion in its March 29, 2016 Order when it deducted [Father's] voluntary retirement contributions of $18,000.00 annually from his gross income in determining his support obligation?

Mother's Brief at 10.[4]

_____

[3] We note the deplorable state of the record certified to us on appeal. While a list of ninety-four docket entries was provided, none of the items in the record bear corresponding numbers, rendering the numbered list useless as an aid to locating documents. There are eight subparts to the record, two of which are single pages, with no explanation or organization to the subparts. While we could have remanded for the provision of organization to the record, with considerable waste of time and talent we have been able to locate the items crucial to our disposition of this case. Such dereliction will not be tolerated in the future.

[4] For the sake of clarity and ease of disposition, we have re-ordered issues B and C.

Our standard of review of a trial court's decision in a support case is well settled:

> When evaluating a support order, this Court may only reverse the trial court's determination where the order cannot be sustained on any valid ground. We will not interfere with the broad discretion afforded the trial court absent an abuse of the discretion or insufficient evidence to sustain the support order. An abuse of discretion is not merely an error of judgment; if, in reaching a conclusion, the court overrides or misapplies the law, or the judgment exercised is shown by the record to be either manifestly unreasonable or the product of partiality, prejudice, bias or ill will, discretion has been abused. In addition, we note that the duty to support one's child is absolute, and the purpose of child support is to promote the child's best interests.

*Kimock v. Jones*, 47 A.3d 850, 853–854 (Pa. Super. 2012) (citations omitted).

The trial court explained the atypical process in this case due to the parties' agreement to a stipulation of facts, as follows:

> The situation we face in the case at bar is different from the norm. Here, the parties have agreed to a stipulation of facts, and they have asked us to determine support based upon that stipulation and our contextual knowledge about the parties gleaned via the extensive support litigation we handled in 2015. Our Superior Court has long recognized that courts have wide discretion when handling support matters. *See Kotzbauer v. Kotzbauer*, 937 A.2d 487, 489 (Pa. Super. 2007). Given the tortured history of this case, and given the fact that both counsel have asked us to eschew the so-called "normal" support process in Lebanon County, we will undertake the unusual step of eschewing a remand to the DRM in favor of simply rendering our own *de novo* decision based upon the stipulation of the parties.

Trial Court Opinion, 3/29/16, at 6–7.

In a three-paragraph argument, and citing testimony from a Master's hearing on October 29, 2015, Mother first asserts that Father has recurring

stock options in 2014, 2015, 2016, and 2017. Mother's Brief at 19 (citing N.T., 10/29/15, at 15). She contends that the trial court concluded in an August 4, 2015 order that the 2014 stock options shall be included as income for the calendar year 2015. *Id*. She maintains that this conclusion provided additional monthly income attributable to Father of $2,958.74. *Id*. (citing Trial Court Opinion (Exceptions), 8/4/15, at 14–15.) Mother suggests the trial court relied on *MacKinley v. Messerschmidt*, 814 A.2d 680 (Pa. Super. 2002), for the proposition that stock options must be considered as income for purposes of support. She further avers that while the trial court indicated it would consider the vested stock options as part of Father's 2015 income, Trial Court Opinion (Exceptions), 8/4/15, at 14 n.12, the trial court, in its March 29, 2016 order, modified the child support payments "effective August 1, 2015." Mother's Brief at 20. The effect of this action, Mother suggests, is that the trial court never included in its calculations the 2014 stock options for the period from August of 2015 through December of 2015. Mother posits that this failure by the trial court granted to Father a five-month "increase in income for which he was not paying support" to Child. *Id*. Therefore, Mother claims the amount of Father's income for the months August 2015 through December 2015 should be increased by $2,958.74 per month. *Id*.

Based upon the following explanation by the trial court, we conclude that this issue is waived:

As outlined in our March 29, 2016 Opinion, the parties requested us to render a decision based upon a Stipulation of Fact. We acceded to the parties' request. When the parties forwarded the Stipulation, we had a question about what we perceived to be an ambiguity regarding FATHER's RSU. As a result, we authored a letter to the parties. That letter is attached to this Opinion as Exhibit A. Following our letter, we received a response from FATHER's counsel. That response is attached as Exhibit B.[1] **MOTHER's counsel did not respond at all**.

> [1] We believe that at least one date is incorrect. We recall receiving the letter before we issued our March 2016 Opinion.

Fairly read, the communication outlined above between counsel and [this c]ourt confirmed our belief that FATHER's total RSU for 2015 was $30,728.88. To the extent that MOTHER now claims that we erred in determining the amount of the RSU as set forth on the Stipulation, MOTHER has no one to blame but herself. We afforded her with the opportunity to present information via the stipulation regarding the RSU's and the opportunity to supplement the record and /or object to FATHER'S claim that he received "only" $30,728.88 in RSU payments during 2015. **She did neither**. Based upon the communication between counsel and [this c]ourt outlined above, it would be disingenuous to argue that this [c]ourt erred by valuing FATHER's RSU receipts at anything other than $30,728.88.

Pa.R.A.P. 1925(a) Opinion, 4/28/16, at 2–3 (emphases added).

The parties specifically stipulated that Father's income in 2015 included the amounts listed on his W-2 and included only the total stock options exercised of $30,728.88 before taxes. When the trial court later requested clarification, Mother did not respond; therefore, the trial court had no further information from Mother and no way to ascertain Mother's disagreement with the trial court's determination of Father's income. "On appeal, we will not consider assignments of error that were not brought to

the tribunal's attention at a time at which the error could have been corrected or the alleged prejudice could have been mitigated." ***State Farm Mutual v. Dill***, 108 A.3d 882, 885 (Pa. Super. 2015) (*en banc*), *appeal denied*, 116 A.3d 605 (Pa. 2015) (citing ***Tindall v. Friedman***, 970 A.2d 1159, 1174 (Pa. Super. 2009)). This issue is waived.

We next address whether the trial court failed to provide an adjustment for the health insurance premium [Mother] contributes to cover the parties' minor child. Mother references Pa.R.C.P. 1910.16-6(b), which provides that health insurance premiums that provide coverage on behalf of the parties' children "shall be allocated between the parties in proportion to their net incomes...." Mother's Brief at 22. Mother refers to a methodology for calculating the allocable premium amount where specific evidence is not proffered by the moving party:

> In the event that evidence . . . is not submitted by either party, it shall be calculated as follows. First, determine the cost per person by dividing the total cost of the premium by the number of persons covered under the policy. Second, multiply the cost per person by the number of persons who are not owed a statutory duty of support, or are not parties to, or the subject of the support action. The resulting amount is excluded from allocation.

Pa.R.C.P. 1910.16-6(b)(2).

In accordance with Pa.R.C.P. 1910.16, Mother maintains that the trial court should have utilized the same methodology it used to calculate the portion of Father's premium to be allocated between the parties to calculate the portion of Mother's premium to be allocated between the parties.

Instead, according to Mother, it granted Husband an adjustment for the portion of his insurance premium covering Child but did not do the same for Mother, where her insurance policy grants Child health benefits beyond that of Father's insurance. Mother's Brief at 23.

Father responds that in determining the total adjustment to be made for payment of the insurance premium, the trial court excluded three-fourths "of the amount which Father pays for health insurance, and allowed only one-quarter ($^1/_4$) of the payments which Father actually makes, indicating that since four individuals were covered, and only one" is the minor child, "only one-quarter ($^1/_4$) of the premium should be allocated" for Child. Father's Brief at 13–14. Mother's annual cost for her premium apparently is $600.29, which covers three individuals on her plan. Trial Court Opinion, 3/29/16, at 5. Thus, she is contending that one-third of these premiums, or $200.00 annually, is the amount the court should have allocated toward insurance. Father also notes that Father, not Mother, has been ordered to provide health insurance. Father's Brief at 14.

The trial court addressed the issue as follows:

> According to the parties' stipulation, both MOTHER and FATHER pay money for medical, dental and vision insurance. The stipulation indicates that FATHER contributes $4,981.41 "for the benefit of himself and his family." The stipulation further stipulates that MOTHER contributes $600.29 "for the benefit of herself and her children." Nothing was specifically presented to indicate which children were or were not covered by the amounts contributed by each parent.

Health insurance premiums are addressed in Pennsylvania's Support Guidelines. Generally, health insurance premiums are to be

> allocated between the parties in proportion to their net . . . incomes, including the portion of the premium attributable to the party who is paying it, as long as a statutory duty of support is owed to the party who is paying the premium. If there is no statutory duty of support owed to the party who is paying the premium, the portion attributable to that person must be deducted from the premium as set forth in subdivision (2) below.

Pa.R.C.P. 1910.16 -6(b)[(1)]. Subdivision (2) states:

> When the health insurance covers a party to whom no statutory duty of support is [owed . . . ] the portion of the premium attributable to them must be excluded from allocation.

Pa.R.C.P. 1910.16-6(b)(2). Moreover, the Support Guidelines also create a methodology that can be applied when a parent pays for health insurance that covers more than simply the children who are the subject of the Support Order. The rules state:

> In the event that evidence as to this portion is not submitted by either party, it shall be calculated as follows. First; determine the cost per person by dividing the total cost of the premium by the number of persons covered under the policy. Second, multiply the cost per person by the number of persons who are not owed a statutory duty of support, or are not parties to, or the subject of the support action. The resulting amount is excluded from allocation.

Pa.R.C.P. 1910.16-6(b)(2). Furthermore, the rules provide an example that is almost exactly on point:

Example 3. The parties are divorced and Mother is the obligee of a child support order. Father, the obligor, pays $200 per month toward the cost of a health insurance policy provided by his

employer that covers himself and the parties' child. Mother pays $400 per month for her employer-sponsored health insurance that covers only herself. The amount of the premium Father pays to cover the parties' child, $100 ($200 premium divided between two covered persons, Father and the child), will be allocated between the parties in proportion to their respective incomes. The portion of the premium that covers Father will not be allocated because the parties are no longer married and he is not owed a duty of support by Mother. The premium Mother pays to provide her own coverage will not be allocated because the parties are no longer married and she is not owed a duty of support by Father.

Pa.R.C.P. 1910.16-6(b)[Example 3].

In this case, there is no need for both MOTHER and FATHER to provide insurance coverage for the children. In our Court Orders entered in 2015, we ordered that FATHER provide health insurance for the children. In her most recent Recommendation, the DRM similarly imposed a responsibility upon FATHER to provide health insurance for the children.

Without proof that MOTHER's payment of $600.29 per year was needed to purchase insurance that was not available through FATHER's plan, we are not inclined to apply the Support Guidelines to MOTHER's payment of $600.29. With respect to FATHER's payment of health insurance benefits, we note that FATHER's payment of $4,981.41 covers four individuals, only one of whom is the child in question. Therefore, the calculation that applies in this case will be as follows:

(1) $4,981.41 ÷ 4 individuals covered = $1,245.35 per person.

(2) $1,245.35 per person x 3 individuals not owed a duty of support = $3,736.06 that must be excluded from consideration.

(3) $1,245.35 = the amount of FATHER's insurance contribution that can be allocated solely for the child at issue.

Based upon the above, we will allocate the sum of $1,245.35 to the parties in accordance with their percentage of net income as outlined in the preceding sections of the Support Guidelines.

Trial Court Opinion, 3/29/16, at 11–14.

We have considered the arguments of the parties and the explanation of the trial court and considered the record as a whole. Based upon the record, we conclude that this issue is meritless.

Finally, Mother asserts, relying on **Portugal v. Portugal**, 798 A.2d 246, 253 (Pa. Super. 2002), that in its August 4, 2015, and March 29, 2016 orders, the trial court declined to include Father's **voluntary retirement contributions** as income for purposes of child support. Mother's Brief at 20. Mother maintains that she sought Father's **voluntary** contributions, not Father's **employer's** contributions. She avers that the parties' Stipulation of Facts provided that Father voluntarily contributed $18,000 to his 401(k) in 2015. Mother identified the issue in her Pa.R.A.P. 1925(b) statement.

In **Portugal**, the wife argued that the trial court erred in failing to include the husband's contribution to his 401(k) plan and his employer's matching contribution to the plan, in the court's determination of the husband's income. The **Portugal** Court examined Pa.R.C.P. 1920.16-5 and concluded, "Upon our consideration of this provision, we find that only non-voluntary retirement payments are properly excludable from a parent's net monthly income. Conversely stated, **the trial court must include any voluntary contributions that a parent makes to his/her retirement**

**plan as income for support purposes.**" *Portugal*, 798 A.2d at 252 (emphasis added). An employer's contributions to a pension plan were held to constitute income for purposes of support "if the employee could access his employer's contributions (regardless of penalties) at the time of the support calculation." *Id*. at 253. In *MacKinley v. Messerschmidt*, 814 A.2d 680 (Pa. Super. 2002), we articulated that our holding in *Portugal* was "based on the dominant interest of the children's immediate need, as well as the recognition that children should not be made to wait for support[,] and parents should not be permitted to defer income to which they are entitled until they choose to avail themselves of it." *MacKinley*, 814 A.2d at 683.

The trial court provided, based upon the DRM's disposition, a detailed and convincing explanation addressing why Husband's **employer's** contributions properly were not included in the calculation of Husband's income. However, that is not the issue identified and presented by Wife.

In its explanation regarding Husband's employer's contribution, and relying upon the description of the DRM, the trial court identified the types of retirement plans both parties enjoy, as follows:

> The court directed both [Mother] and [Father] to produce records regarding the present ability or inability to access funds in their respective employer retirement accounts.
>
> Mother provided a letter from her employer indicating that she is enrolled in a defined benefit plan. Mother is not allowed to access the employer contributions to the plan other than as a monthly annuity at the time of retirement.

Father provided the Vanguard statements for his 401(k) retirement plan, Exh. 4. Father did not provide a plan summary for the 401(k) plan. Based on the information provided by Exh. 4, the plan is a qualified plan.

Trial Court Opinion, 3/29/16, at 8–9 (quoting Supplemental Findings and Recommendations of Domestic Relations Master, 5/15/15, at 2). The specific focus of both the DRM and the trial court was analysis of whether Husband's employer contributions were accessible to Husband.

Our review of the record reveals that Mother's exceptions to the DRM's recommendations identified, *inter alia*, the Master's failure to include Husband's voluntary contributions to his 401(k) plan as income available for support. Upon remand by the trial court, the DRM addressed only the employers' contributions. Mother raised the issue again in her Pa.R.A.P. 1925 (b) statement, and once more, the trial court focused exclusively on Husband's employer's contributions.

The trial court stated the following in addressing the issue:

As we see it, both MOTHER and FATHER have contributed monies from present income to create resources for future retirement. According to the parties' stipulation, FATHER has contributed $18,000.00 to his 401(k) account, which translates to approximately 7% of his pre-tax income. MOTHER has contributed $3,752.00 to her retirement account, which translates to approximately 6.7% of her pre-tax income. There is simply no evidence that either MOTHER or FATHER is "hiding" current income by placing it into a retirement account, and there is no evidence that either MOTHER or FATHER is attempting to circumvent the child support process by manipulating retirement contributions to artificially deflate current income. Given their respective earnings, we do not find either MOTHER's retirement contribution or FATHER's retirement contribution to be inappropriate or manipulative.

> Given that we have concluded that both MOTHER and FATHER have set aside an appropriate amount for their own future retirement, we will not treat their respective retirement contributions differently. As we stated in August of 2015: "What is good for the goose is good for the gander." If we will not be considering MOTHER's decision to set aside 6.7% of her income for retirement, then neither will we consider FATHER's decision to set aside 7% of his income for future retirement. In our view, this approach effectuates justice for all concerned.

Trial Court Opinion, 3/29/16, at 10–11.

Our review of the record compels our agreement with Wife that the trial court erred. Mother had no discretion but to contribute a designated percentage of her earnings into the state retirement system, and the trial court was compelled to deduct those amounts from Mother's monthly gross income in calculating her net income. *See* Pa.R.C.P. 1910.16-2(c)(1)(C) ("Unless otherwise provided in these rules, the court shall deduct only the following items from monthly gross income to arrive at net income: . . . non-voluntary retirement payments.") Conversely, *Portugal* requires that "the trial court must include any voluntary contributions that a parent makes to his/her retirement plan as income for support purposes." *Portugal*, 798 A.2d at 252. Thus, we are compelled to remand this matter to the common pleas court.

Case remanded for a determination of whether Father's contributions to his 401(k) plan are voluntary, and if so, they shall be included as income to Father pursuant to *Portugal* and its progeny. In all other respects, the appeal is affirmed.

- 16 -

Order reversed and case remanded for proceedings consistent with this Memorandum. Jurisdiction is relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>12/6/2016</u>