J-A12003-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| O.C. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| L.A. | : | No. 1443 MDA 2020 |

Appeal from the Order Entered October 14, 2020
In the Court of Common Pleas of Luzerne County
Civil Division at No:  2018-06284

BEFORE:  LAZARUS, J., STABILE, J., and MUSMANNO, J.

MEMORANDUM BY STABILE, J.:　　　　　**FILED: JULY 8, 2021**

O.C. ("Father") appeals from the custody order entered on October 14, 2020, in the Court of Common Pleas of Luzerne County, with respect to his daughter, E.C., born in January of 2016, and his son, D.C., born in November of 2017 (collectively, "the Children").  The order awarded L.A. ("Mother") primary physical custody during the school year; Father partial physical custody three days each month in the State of Washington; Father physical custody from June 15th through August 15th every summer; and the parties shared legal custody.  After careful review, we affirm.

The underlying custody case has an extensive procedural history. Father initiated it *pro se* on June 7, 2018.  He alleged that Mother, with whom he cohabited, relocated with the Children to the State of Washington on an unspecified date in May of 2018, without notifying him or seeking court

approval. On June 12, 2018, Father filed *pro se* a petition for special relief. He requested that the trial court return the Children to Luzerne County, Pennsylvania, and award him equally shared physical custody.

Following a custody conciliation conference on July 2, 2018, the parties requested an evidentiary hearing before the trial court. After multiple continuances, the hearing occurred before the Honorable Fred A. Pierantoni, III, on March 26, 2019. By *interim* order dated April 12, 2019, when E.C. was three years old and D.C. seventeen months old, the court granted the parties shared legal custody and physical custody in their respective states every six weeks on an alternating basis and reasonable unmonitored telephone contact. Mother filed a notice of appeal.[1]

In Mother's prior appeal, the trial court filed an opinion pursuant to Pa.R.A.P. 1925(a) where it set forth the procedural history up through the April 12, 2019 *interim* order, as follows:

> While these proceedings were pending in Luzerne County, custody and protection [from abuse ("PFA")] proceedings were being held in the Superior Court of Washington, County of Thurston[,] . . . resulting in an order issued by the Washington Court on September 19, 2018[,] indicating that a [Uniform Child Custody Jurisdiction and Enforcement Act ("UCCJEA"), 23 Pa.C.S. §§ 5401-5482,] hearing be held by both courts on October 26, 2018[,] as it pertains to the custody proceedings.

---

[1] Because Mother did not appeal from a final order, this Court quashed her appeal by order dated June 11, 2019. **O.C. v. L.A.**, 819 MDA 2019 (Pa. Super. 2019).

At that point in time the Washington Court had issued an order of protection for [one] year effective June 21, 2018, which protected Mother and [the C]hildren. The [PFA] Order has been docketed in Luzerne County to 2018-14593.

During the course of the hearing pursuant to the [UCCJEA], [Mother] testified that she did not file [PFA] proceedings in . . . Pennsylvania and did not do so until she traveled to the State of Washington. She indicated that when she moved out of . . . Pennsylvania[,] she did not notify [F]ather.

At the conclusion of testimony, both [c]ourts agreed that the Pennsylvania Court would accept the jurisdiction of the custody matter[,] and the Pennsylvania Court indicated that the [PFA] order in the State of Washington would be afforded full faith and credit and will be enforced in . . . Pennsylvania. . . . The [c]ourt noted that the [PFA order] included a no[-]contact provision regarding [F]ather and the [C]hildren[,] which had not been modified at that time. . . .

. . .

On January 8, 2019, [F]ather filed a [p]etition to [m]odify the [PFA] [o]rder in the Luzerne County Court of Common Pleas. . ., and on February 21, 2019[,] the parties agreed to modify the [PFA] order from the State of Washington to reflect the removal of the Children as protected parties. . . .

Trial Court Opinion, 5/22/19, at 3-5 (footnote and citations to record omitted).

Following the April 12, 2019 *interim* order, Mother filed a complaint for custody on April 26, 2019, where she requested sole legal and physical custody of the Children. Mother alleged specific incidents of abuse by Father against her in the presence of the Children, and she feared for the Children's safety. Further, Mother alleged that she is the Children's primary caretaker and the better able than Father to provide for the Children's needs. On that

- 3 -

same date, Mother filed a motion to stay the *interim* order, which the trial court denied.

Father's six-week custody period commenced on May 7, 2019. On July 9, 2019, Father filed a petition for special relief and for contempt where he requested to enroll the Children in a pre-school in Luzerne County. He also asserted that Mother violated the *interim* order by not providing him with reasonable telephone contact.

On July 23, 2019, Mother filed an emergency petition for special relief where she alleged that the Children returned from Father's custody with changes in behavior and regression in their physical development. Specifically, she alleged that E.C., who had been toilet-trained for six months, arrived home in a diaper. In addition, Mother alleged that Father had failed to provide her with reasonable unmonitored telephone contact. Mother requested that the court award her temporary physical and legal custody and Father supervised visits in the State of Washington, pending a full custody trial. As best we can discern, on July 25, 2019, the trial court ordered a psychological evaluation of the Children by Lori Losen, LPC, RPT-S, a licensed professional counselor and expert in child counseling.

On October 9, 2019, Mother filed another motion to stay the April 12, 2019 *interim* order, where she attached the psychological evaluation by Ms. Losen dated September 6, 2019. The court granted Mother's motion to stay on October 22, 2019.

Ms. Losen opined in the written evaluation that disruptions in a child's secure attachment to his or her primary caretaker from the age of six weeks to two years old "can have profound effects on the child's future mental and behavioral health." Motion, 10/9/19, Exhibit A at 10. Ms. Losen concluded that the Children "have been impacted by disruption in attachment and[,] in my opinion, detrimentally." *Id.* Ms. Losen recommended that (1) the Children be assessed by a professional "trained in attachment theory"; (2) the Children participate in therapy to develop a secure attachment with their parents; and (3) Mother and Father seek parenting support and/or individual therapy. *Id.*

Following a hearing before Judge Pierantoni on January 14, 2020, the trial court modified the April 12, 2019 *interim* order on the record in open court. The court directed that the Children be assessed by a professional trained in attachment therapy, and that the parents seek therapy. N.T., 1/14/20, at 124. In addition, the court ordered an updated report by Ms. Losen. *Id.*

Further, the court denied Father's motion for contempt, but granted his petition for special relief by directing that he have one daily videoconference with the Children at 7:30 p.m. eastern time. *Id.* The court granted Mother's petition for emergency special relief by reducing Father's partial custody to a five-day period in Pennsylvania during the last week of each calendar month. *Id.* The court filed an *interim* order to this effect on January 17, 2020. The order specified that the Children participate in a follow-up evaluation with Ms.

Losen the first week of Father's new custodial period, which the order provided would commence on January 27, 2020.

On February 20, 2020, Mother filed a petition for special relief, which she amended on February 21, 2020, alleging that Father failed to schedule the Children's follow-up evaluation with Ms. Losen. In addition, Mother alleged that Father's custodial period commenced at 3:00 a.m. on January 28, 2020, causing the Children emotional upheaval by being awakened and having their custody transferred in the middle the night. Upon the Children's return to the State of Washington, Mother alleged, *inter alia*, that they "continued to express regressive behavior. . . ." ***Id.*** at ¶ 6.

On March 17, 2020, following a hearing on Mother's amended special relief petition, the trial court modified the January 17, 2020 *interim* order. The court directed that Mother transport the Children to Pennsylvania on April 5, 2020, for their participation in the follow-up evaluation with Ms. Losen on April 6, 2020. The court granted Father custody on April 5, 2020, when the Children arrived in Pennsylvania, and directed that he bring them to the evaluation on April 6, 2020. After the evaluation, the court granted Father custody until 5:00 p.m. on April 6, 2020. Moreover, the court suspended Father's overnight custodial periods and reduced his custody to eight hours during the day in the State of Washington, upon ten days of notice to Mother. Further, the court rescheduled the custody trial for June 16 and 17, 2020.

Thereafter, following emergency status conferences, the court issued *interim* orders on April 8, 2020, and May 20, 2020. For reasons not specified in the record, the *interim* orders rescheduled the Children's follow-up evaluation with Ms. Losen, continued the custody trial, and set forth a temporary custody schedule for Father similar to that provided in the March 17, 2020 *interim* order.

The custody trial occurred before the Honorable William H. Amesbury on September 23 and 24, 2020.[2] Father testified on his own behalf, and he presented the testimony of Ms. Losen, who performed the Children's follow-up evaluation on August 3, 2020, when E.C. was four years old, and D.C. was two years and nine months old. In addition, Father presented the testimony of L.F., his girlfriend.

Mother testified on her own behalf, and she presented the testimony of J.A., the Children's maternal grandmother; Lisa Brawn, a licensed family therapist in the State of Washington and E.C.'s therapist; and Carrie Pipkin, a licensed mental health counselor and child and family therapist in the State of Washington and D.C.'s therapist.

By order dated and entered on October 14, 2020, the trial court awarded the parties shared legal custody, and Mother primary physical custody during

---

[2] The court conducted the hearing remotely due to the Covid-19 protocol.

all calendar months except from June 15 through August 15, when Father shall have custody in Pennsylvania. During the months that Mother has primary physical custody, the court awarded Father partial custody three days each month on a weekend of his choosing in the State of Washington. The order also provided for the allocation of transportation costs, and it set forth a holiday schedule. This timely appeal followed.[3]

On appeal, Father presents the following issues for our review:

1. Did the trial court commit errors of law and abuse its discretion in awarding Mother primary physical custody of the [C]hildren where the statutory factors in the Pennsylvania Child Custody Act, [23] Pa.C.S. § 5328, do not support the grant of primary physical custody?

2. Did the trial court commit errors of law and abuse its discretion in awarding Mother primary physical custody of the [C]hildren, and, essentially, allowing Mother to relocate with the [C]hildren to [the State of] Washington, where Mother's move to [the State of] Washington with the [C]hildren was in violation of the Pennsylvania Child Custody Act, [23] Pa.C.S. § 5337?

Father's brief at 5.

We review Father's issue according to the following scope and standard of review:

> [T]he appellate court is not bound by the deductions or inferences made by the trial court from its findings of fact, nor must the reviewing court accept a finding that has no competent evidence to support it. . . . However, this broad scope of review does not vest in the reviewing court the

---

[3] Father filed his appeal on November 12, 2020, which included a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

duty or the privilege of making its own independent determination. . . . Thus, an appellate court is empowered to determine whether the trial court's incontrovertible factual findings support its factual conclusions, but it may not interfere with those conclusions unless they are unreasonable in view of the trial court's factual findings; and thus, represent a gross abuse of discretion.

*R.M.G., Jr. v. F.M.G.*, 986 A.2d 1234, 1237 (Pa. Super. 2009) (quoting *Bovard v. Baker*, 775 A.2d 835, 838 (Pa. Super. 2001)).  Moreover,

[O]n issues of credibility and weight of the evidence, we defer to the findings of the trial [court] who has had the opportunity to observe the proceedings and demeanor of the witnesses.

The parties cannot dictate the amount of weight the trial court places on evidence.  Rather, the paramount concern of the trial court is the best interest of the child.  Appellate interference is unwarranted if the trial court's consideration of the best interest of the child was careful and thorough, and we are unable to find any abuse of discretion.

*R.M.G., Jr., supra* at 1237 (internal citations omitted).  The test is whether the evidence of record supports the trial court's conclusions.  *Ketterer v. Seifert*, 902 A.2d 533, 539 (Pa. Super. 2006).

*A.V. v. S.T.*, 87 A.3d 818, 820 (Pa. Super. 2014).

We have stated:

[T]he discretion that a trial court employs in custody matters should be accorded the utmost respect, given the special nature of the proceeding and the lasting impact the result will have on the lives of the parties concerned.  Indeed, the knowledge gained by a trial court in observing witnesses in a custody proceeding cannot adequately be imparted to an appellate court by a printed record.

*Ketterer*, 902 A.2d at 540 (*quoting Jackson v. Beck*, 858 A.2d 1250, 1254

(Pa. Super. 2004)).

The primary concern in any custody case is the best interests of the child. "The best-interests standard, decided on a case-by-case basis, considers all factors that legitimately have an effect upon the child's physical, intellectual, moral, and spiritual wellbeing." ***Saintz v. Rinker***, 902 A.2d 509, 512 (Pa. Super. 2006), *citing* ***Arnold v. Arnold***, 847 A.2d 674, 677 (Pa. Super. 2004).

Relevant to this custody case are the factors set forth in Section 5328(a) of the Child Custody Act ("the Act"), 23 Pa.C.S. §§ 5321-5340, which provides as follows.

### § 5328.  Factors to consider when awarding custody.

   **(a)  *Factors.*** – In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

   (1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

   (2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

   (2.1) The information set forth in section 5329.1(a)(1) and (2) (relating to consideration of child abuse and involvement with protective services).

   (3) The parental duties performed by each party on behalf of the child.

   (4) The need for stability and continuity in the child's education, family life and community life.

- 10 -

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another.  A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S. § 5328(a).

This Court has stated that, "**[a]ll** of the factors listed in section 5328(a) are required to be considered by the trial court when entering a custody order." ***J.R.M. v. J.E.A.,*** 33 A.3d 647, 652 (Pa. Super. 2011) (emphasis in original). Further,

> Section 5323(d) provides that a trial court "shall delineate the reasons for its decision on the record in open court or in a written opinion or order." 23 Pa.C.S.A. § 5323(d). Additionally, "section 5323(d) requires the trial court to set forth its mandatory assessment of the sixteen [Section 5328 custody] factors prior to the deadline by which a litigant must file a notice of appeal." ***C.B. v. J.B.,*** 65 A.3d 946, 955 (Pa. Super. 2013), *appeal denied*, 70 A.3d 808 (Pa. 2013). . . .
>
> In expressing the reasons for its decision, "there is no required amount of detail for the trial court's explanation; all that is required is that the enumerated factors are considered and that the custody decision is based on those considerations." ***M.J.M. v. M.L.G.,*** 63 A.3d 331, 336 (Pa. Super. 2013), *appeal denied*, [620 Pa. 710], 68 A.3d 909 (2013). A court's explanation of reasons for its decision, which adequately addresses the relevant factors, complies with Section 5323(d). ***Id.***

***A.V.***, 87 A.3d at 822-823. With these standards in mind, we turn to the merits of this appeal.

In this case, the trial court set forth all of the Section 5328(a) best interest factors in its opinion that accompanied the subject order, except for Section 5328(a)(2.1).[4] The court found Section 5328(a)(1) in favor of Father. The court found Section 5328(a)(3), (4), (9), (10), and (16) in favor of

---

[4] The Act was amended, effective January 1, 2014, to include the additional factor at 23 Pa.C.S. § 5328(a)(2.1). The trial court here failed to consider this section. Based on the record evidence, we conclude that the court's omission is harmless.

Mother.[5]  The court found inapplicable Section 5328(a)(2), (6), (7), (8), and (15).  The court found the remaining factors neutral between the parties.

The court found determinative Section 5328(a)(4), the need for stability and continuity in the child's education, family life, and community life.  The court stated, "Since May of 2018, [the Children] have become firmly established in [the State of] Washington.  Friends, family, education and medical care have taken root during this year and a half period."  Trial Court Opinion, 10/14/20, at ¶ 4.  With respect to Section 5328(a)(16), any other relevant factor, the court stated that it

> firmly believes the [C]hildren are entitled to both parents.  But for the ages of E.C who was born in 2016[,] and D.C. who was born in 2017, and the geographic distance between the parents, this is a case which should result in both shared legal and physical custody.  That not being the case at hand[,] and recognizing the year and a half of established routine and supporting relationships, this [c]ourt issues [its] [o]rder.

_____

[5] With respect to Section 5328(a)(3), the parental duties performed by each party, the court found, "This factor is factually neutral to this specific case. However, because of the age of the [C]hildren, it favors Mother at this time. As the [C]hildren get older, this generally recognized advantage of Mother's will diminish."  Trial Court Opinion, 10/14/20, at ¶ 3.  With respect to Section 5328(a)(10), which party is more likely to attend to the daily physical, emotional, developmental, educational, and special needs of the child, the court found, "This factor is neutral but for the above noted preference of very young [C]hildren bonding initially with Mother.  As the [C]hildren age, this factor will apply equally to both parents." *Id.* at ¶ 10.  To the extent that the court discusses how these factors will be applied when the Children are older, we caution the court that its task was to apply the statutory factors to the present circumstances of this case and not to speculate about the future.

*Id.* at ¶ 16. The court based its conclusions on the report and testimony of Ms. Losen, which it found credible.

Ms. Losen testified, "[T]he impact o[n] a young child being [away from] his/her primary caregiver for six weeks will also leave its mark. Children thrive in consistent environments with consistent caregivers. Separations and changes in routine are often contributing factors to developing anxiety disorders." N.T., 9/23/20, at 47. In the September 6, 2019 written evaluation, she explained:

> From the age of 6 weeks to 2 years it is the brain's job to organize, ideally around a safe, attuned, well-regulated primary caretaker, therefore developing a "secure attachment." Studies have found that disruptions in attachment during this time[-]period can have profound effects on the child's future mental and behavioral health. Trauma certainly impacts early brain development more severely than in later years. For example, you might not speak or hug your 16-year-old for a week with little to no damage[;] however[,] if you do that to your 1[-]year[-]old there is a much bigger impact on neural connections. These are referred to as "sensitive periods" of brain development.

Psychological Evaluation, 9/6/19, at 10.

Ms. Losen testified that, in this case, the Children "are primarily attached to their mom." *Id.* at 67. She testified, "I think they see, at least the oldest, [E.C.,] sees [Mother] as the primary caretaker. That was quite evident in the second evaluation. So to rip that child from [M]other would be . . . detrimental to development." *Id.* at 64.

At the time of the September 6, 2019 evaluation, D.C. was approximately twenty-two months old. Ms. Losen stated in the evaluation:

Given [D.C.]'s age, long separations from primary caregivers can be problematic in forming secure attachments. [D.C.]'s reaction to [M]other clearly indicates a disruption in bonding which can have long[-]term detrimental effects.

[D.C.] shows a more secure attachment to [F]ather, given [that F]ather had been caring for him for the past 5 weeks at the time of assessment.

Additionally, due to [D.C.]'s strange behavior with therapist, there appears to be an impact in his ability to see the world as "safe." Typical behavior when a child this age is with the primary caregiver (safe person) would be to interact with the stranger as long as safe person is close. [D.C.] appears to freeze or dissociate when therapist attempted to interact.

Psychological Evaluation, 9/6/19, at 10.

Ms. Losen further testified that, in performing her evaluation of E.C., she requested that the parents complete a child behavior checklist, "which is self-reported symptoms of what kind of behaviors they're seeing at home."[6] *Id.* at 21. She explained, "The child behavior checklist pairs with the DSM-5 for diagnosis." *Id.* at 23.

Ms. Losen testified that Mother's checklist indicated that E.C. "was in the borderline clinical range for [being] emotionally reactive and she had a score of five for anxious[,] depressed. She also had a [score of] seven for aggressive behavior, [and] that result [was] more appropriate to what I observed with [E.C.]." *Id.* With respect to the scores on Father's checklist,

---

[6] For reasons unspecified in the record, the parents completed a child behavior checklist for E.C. only.

Ms. Losen testified, "his was extremely low. So I wasn't sure whether that was due to [him] misunderstanding or not wanting to fill it out." *Id.*

In sum, Ms. Losen concluded in her written evaluation:

Certainly, [the C]hildren have been impacted by disruption in attachment[,] and[,] in my opinion, detrimentally. They both exhibit severe hypervigilance in the presence of strangers. [E.C.] shows a need to control her environment[,] which might indicate an underlying anxiety disorder. It is hard to believe that dad's [child behavior checklist] is accurate, as it is very evident that [E.C.] shows behavioral symptoms.

Psychological Evaluation, 9/6/19, at 10.

In his first issue on appeal, Father argues that the trial court failed to delineate adequately the reasons for its decision. He asserts, "the trial court's application of the [Section 5328(a)] factors lacks any in-depth analysis." Father's brief at 19. We discern no abuse of discretion. Indeed, the court adequately addressed the statutory best interest factors and based its custody decision on them. *See M.J.M.*, 63 A.3d at 336 (stating, "there is no required amount of detail for the trial court's explanation; all that is required is that the enumerated factors are considered and that the custody decision is based on those considerations.").

In addition, Father argues that the court abused its discretion with respect to the weight it placed on evidence that favored him, such as Ms. Losen's testimony that she did not observe any symptoms of abuse in the Children. *See* N.T., 9/23/20, at 45 (Ms. Losen testified on direct examination, "I did not see any symptoms of abuse. As I stated in my first report, that's

very, very difficult to determine in a one day assessment, and[,] if that can ever be determined[,] is a question."). As such, Father argues that the court abused its discretion in not weighing Section 5328(a)(2) in his favor, rather than finding it inapplicable. We disagree insofar as the court did not base its custody decision on Mother's allegations of Father's abuse against her and her related fear for the Children's safety.

Father also argues, with respect to Section 5328(a)(3), (4) and (9), that the court did not properly weigh Ms. Losen's testimony that she had no concerns about his fitness as a parent. The relevant testimony on direct examination is as follows:

> Q. Based on what you observed in the second evaluation, did [Father] display any behavior that caused you any concerns in terms of his fitness as a parent?
>
> A. I don't have any concerns as to his fitness as a parent, although I do have concerns with his ability to be the parent in the relationship with [the C]hildren. I will caveat that with saying I can understand how a parent [who] doesn't have frequent contact with a child which would much rather be their friend than a parent[.] I would say that [Father] will need [therapeutic] support if he gets increased visitation in order to be the parent and be able to provide appropriate structure for the [C]hildren. . . .

N.T., 9/23/20, at 44. We discern no abuse of discretion.

The trial court did not disagree Father is a fit parent who is capable of performing parental duties. However, the court based its custody decision on Ms. Losen's opinion that the Children have been negatively affected by disruptions in their secure attachment to either parent. The court found that, at present, they are primarily attached to Mother, and that they would be

- 17 -

further harmed by disrupting that attachment at this stage in their development. We conclude that, as applied to Section 5328(a)(4) and (9), the weight that the court placed on the evidence is reasonable.

Father also contends, with respect to Section 5328(a)(3), (4), (8), that the court failed to weigh the evidence that Mother "is the one who took the [C]hildren away from Father by moving several thousand miles from their home in Hazleton, Pennsylvania, to the [S]tate of Washington without Father's permission." Father's brief at 17. Although we sympathize with Father's argument, we discern no abuse of discretion.

The court's task was to determine the best interests of the Children. In May of 2018, when Mother relocated with the Children, E.C was two years and four months old, and D.C. was six months old. By the time of the custody trial, the Children had lived in the State of Washington for more than two years. Ms. Losen's expert opinion was that the Children had been detrimentally affected by the lengthy disruption in their secure attachment to either parent. By the time of trial, the Children's primary attachment was to Mother. In addition, the Children's therapists testified that they displayed negative behavior after their custodial visit to Father in Pennsylvania. *See* N.T., 9/23/20, at 128 (Lisa Brawn, E.C.'s therapist since November of 2019, testified that, after visiting Father in Pennsylvania, E.C. "presented as more anxious, agitated, distracted, and more emotional."); *id.* at 140 (Carrie Pipkin, D.C.'s therapist since February of 2020, testified that, after visiting Father in

Pennsylvania, D.C. displayed "More aggression. [Mother] reported . . . behaviors, which I saw over Telehealth, including [D.C.] bit[ing] his mom, more discord with his sister, not following some general safety rules, running away from mom, things like that, not being able to sleep alone was another thing, and [regression in] toileting issues."). Based on this record evidence, we will not disturb the amount of weight the court placed on Mother's relocation with the Children without notifying Father or seeking court approval in May of 2018. As such, Father's first issue fails.

In his second issue, Father argues that the custody award allowed Mother to relocate with the Children to the State of Washington in violation of 23 Pa.C.S. § 5337 (Relocation). Father has waived this issue on appeal for failing to raise it in the trial court.

Issues not raised in the lower court are waived and cannot be raised for the first time on appeal. Pa.R.A.P. 302(a). This Court has explained:

> On appeal, we will not consider assignments of error that were not brought to the tribunal's attention at a time at which the error could have been corrected or the alleged prejudice could have been mitigated. ***Tindall v. Friedman***, 970 A.2d 1159, 1174 (Pa. Super. 2009). "In this jurisdiction one must object to errors, improprieties or irregularities at the earliest possible stage of the adjudicatory process to afford the jurist hearing the case the first occasion to remedy the wrong and possibly avoid an unnecessary appeal to complain of the matter." ***Id.*** (quoting ***Thompson v. Thompson***, 963 A.2d 474, 475-76 (Pa. Super. 2008) (citation omitted)).

***State Farm Mutual v. Dill***, 108 A.3d 882, 885 (Pa. Super. 2015) (*en banc*).  Thus, we will not consider Father's second issue.  Accordingly, we affirm the custody order.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 07/08/2021